KIMBERLY AROUH (SBN 163285)
kimberly.arouh@bipc.com
JASMINE WETHERELL (SBN 288835)
Jasmine.wetherell@bipc.com
BUCHANAN INGERSOLL & ROONEY LLP
600 W. Broadway, Suite 1100
San Diego, CA  92101
Telephone:  (619) 239-8700
Fax Number:  (619) 702-3898

Attorneys for Defendant
The Olson Research Group, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| Retina Associates Medical Group, Inc.; and Acutecare Health System, LLC; individually and on behalf of all others similarly situated, | Case No. 8:18-cv-01997-DOC-KES |
| | Assigned to Judge David O. Carter |
| Plaintiffs, | **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) or STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE** |
| vs. | |
| The Olson Research Group, Inc., | |
| Defendant. | |
| | DATE:          March 18, 2019 |
| | TIME:          8:30 a.m. |
| | COURTROOM:     D9 |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**
Case No. 8:18-cv-01997-DOC-KES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

RELEVANT FACTUAL ALLEGATIONS .................................................................. 4

RELEVANT PROCEDURAL BACKGROUND .......................................................... 6

ARGUMENT ............................................................................................................... 8

    I.      PLAINTIFFS FAIL TO STATE A CLAIM FOR A TCPA VIOLATION ................. 8

           A.      The TCPA Prohibits Only "Unsolicited *Advertisements*." ............................ 9

           B.      The Faxes Are Not a Pretext for Future Advertisements............................. 15

    II.     IF THE COURT DOES NOT DISMISS THIS ACTION FOR FAILURE TO STATE A CLAIM, IT SHOULD BE DISMISSED, STAYED, OR TRANSFERRED PURSUANT TO THE "FIRST-FILED RULE." ........................ 17

CONCLUSION............................................................................................................ 19

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alltrade, Inc. v. Uniweld Prods.*,
  946 F.2d 622 (9th Cir 1991) ................................................................. 17

*Ameriguard, Inc. v. Univ. of Kan. Med. Ctr. Research Inst.*,
  2006 WL 1766812 (W.D. Mo. June 23, 2006) ......................... 10, 12, 13, 15

*ARcare v. IMS Health, Inc.*,
  2016 U.S. Dist. LEXIS 125262 (E.D. Ark. Sep. 15, 2016) ................... 9, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................. 8

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................. 8

*Cadenasso v. Metro. Life Ins. Co.*,
  2014 WL 1510853 (N.D. Cal. Apr. 14, 2014) ..................................... 18

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2001) ............................................................. 2

*Davis Neurology, P.A. v. BSM DoctorDirectory.com, LLC*,
  2017 U.S. Dist. LEXIS 61469 (E.D. Ark. Mar. 20, 2017), *rev'd on other*
  *grounds*, 896 F.3d 872 (8th Cir. 2018) ......................................... 10, 16

*EEOC v. Univ. of Pa.*,
  850 F.2d 969 (3d Cir. 1988) ................................................................ 17

*EFG Bank Ag v. Lincoln Nat'l Life Ins. Co.*,
  2017 U.S. Dist. LEXIS 220049 (C.D. Cal. June 8, 2010) ................. 17, 18

*Fischbein v. The Olson Research Group, Inc.*,
  No. 17-05601 (E.D. Pa., filed Dec. 14, 2017) ............................... *passim*

*Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*,
  2017 U.S. App. LEXIS 9904 (11th Cir. June 5, 2017) ......................... 10

*Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*,
  342 U.S. 180 (1952) ............................................................................ 17

- ii -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**
Case No. 8:18-cv-01997-DOC-KES

*Knievel v. ESPN,*
   393 F.3d 1068, 1076 (9th Cir. 2005) .......................................................... 2

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.,*
   787 F.3d 1237 (9th Cir. 2015) .......................................................... 18, 19

*Lutz Appellate Servs. v. Curry,*
   859 F. Supp. 180 (E.D. Pa. 1994) .......................................................... 10

*Luviano v. Multi Cable, Inc.,*
   2017 U.S. Dist. LEXIS 32349 (C.D. Cal. Jan. 3, 2017) .............................. 2

*Marder v. Lopez,*
   450 F.3d 445 (9th Cir. 2006) .................................................................. 2

*Mauthe v. Nat'l Imaging Assocs.,*
   No. 17-1916, 2018 U.S. Dist. LEXIS 72906 (E.D. Pa. Apr. 25, 2018) .............. 7, 10, 14, 15

*Mauthe v. National Imaging Assocs.,*
   No. 18-2119 (3d Cir., filed May 18, 2018) ............................................ 7, 14

*Mauthe v. Optum, Inc.,*
   2018 U.S. Dist. LEXIS 125796 (E.D. Pa. July 27, 2018) .......................... 9, 14

*Mauthe v. Optum, Inc.,*
   No. 18-2894 (3d Cir., filed Aug. 24, 2018) .............................................. 14

*Mims v. Arrow Fin. Servs., LLC,*
   565 U.S. 368 (2012) ............................................................................ 1

*N.B. Industries, Inc. v. Wells Fargo & Co.,*
   2010 WL 4939970 (N.D. Cal. Nov. 30, 2010), *aff'd*, 465 F. App'x 640 (9th Cir. 2012) ........................................................................................... *passim*

*Pac. Rollforming, LLC v. Trakloc N. Am., LLC,*
   2010 U.S. Dist. LEXIS 60756 (S.D. Cal. June 18, 2010) .............................. 8

*Pacesetter Sys. v. Medtronic, Inc.,*
   678 F.2d 93 (9th Cir. 1982) ................................................................ 17

*Parrino v. FHP, Inc.,*
   146 F.3d 699 (9th Cir. 1998) ................................................................ 2

*PETA, Inc. v. Beyond the Frame, Ltd.,*
   2011 WL 686158 (C.D. Cal. Feb. 16, 2011) ........................................ 17, 18

- iii -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

*Phillips Randolph Enters., L.L.C. v. Adler-Weiner Research Chi., Inc.,*
    526 F. Supp. 2d 851 (N.D. Ill. 2007) ........................................................ 9, 10, 12, 15

*Ross v. U.S. Bank Nat'l Ass'n,*
    542 F. Supp. 2d 1014 (N.D. Cal. 2008) ........................................................ 17, 18

*Sandusky Wellness Ctr., LLC v. Medco Health Solutions, Inc.,*
    788 F.3d 218 (6th Cir. 2015) ........................................................ 13, 14, 15, 16

*Scharff v. Raytheon Co. Short Term Disability Plan,*
    2007 WL 2947566 (C.D. Cal. June 22, 2007) ........................................................ 8

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 2002) ........................................................ 2

*Supply Pro Sorbents, LLC v. RingCentral, Inc.,*
    2017 U.S. Dist. LEXIS 214838 (N.D. Cal. July 17, 2017) ........................................................ 11

*Supply Pro Sorbents, LLC v. RingCentral, Inc.,*
    743 F. App'x 124 (9th Cir. 2018) ........................................................ 11

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) ........................................................ 2

**Statutes**

47 U.S.C. § 227(a)(5) ........................................................ 9, 13, 14

47 U.S.C. § 227(b)(1)(C) ........................................................ 1, 9

*In re the Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ........................................................ 9

*Junk Fax Prevention Act of 2005,* 21 F.C.C.R. 3787 (April 6, 2006) ........................................................ 9

**Other Authorities**

47 C.F.R. § 64.1200(f)(15) ........................................................ 9

71 Fed. Reg. 25967-01, *25,973 (May 3, 2006) ........................................................ 11

Fed. R. Civ. P. 8(a)(2) ........................................................ 8

Fed. R. Civ. P. 12(b)(6) ........................................................ 1, 2, 7, 8

Fed. R. Evid. 201(b) ........................................................ 2

- iv -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**
Case No. 8:18-cv-01997-DOC-KES

**Page(s)**

**Cases**

*Alltrade, Inc. v. Uniweld Prods.*,
  946 F.2d 622 (9th Cir 1991) ................................................................ 20

*Ameriguard, Inc. v. Univ. of Kan. Med. Ctr. Research Inst.*,
  No. 06-0369, 2006 WL 1766812 (W.D. Mo. June 23, 2006)........................................ 12, 15, 18

*ARcare v. IMS Health, Inc.*,
  No. 2:16-cv-00080, 2016 U.S. Dist. LEXIS 125262 (E.D. Ark. Sep. 15, 2016).................. 11, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................. 9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................. 9, 10

*Cadenasso v. Metro. Life Ins. Co.*,
  No. 13-cv-05491, 2014 WL 1510853 (N.D. Cal. Apr. 14, 2014)................................. 21

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2001) .............................................................. 2

*Davis Neurology, P.A. v. BSM DoctorDirectory.com, LLC*,
  No. 4:16-cv-00682, 2017 U.S. Dist. LEXIS 61469 (E.D. Ark. Mar. 20, 2017),
  *rev'd on other grounds,* 896 F.3d 872 (8th Cir. 2018) ......................................... 12, 19

*EEOC v. Univ. of Pa.*,
  850 F.2d 969 (3d Cir. 1988)..................................................................... 20

*EFG Bank Ag v. Lincoln Nat'l Life Ins. Co.*,
  No. 17-817, 2017 U.S. Dist. LEXIS 220049 (C.D. Cal. June 8, 2010) ...................... 21

- v -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**
Case No. 8:18-cv-01997-DOC-KES

*Fischbein v. The Olson Research Group, Inc.*,

No. 17-05601 (E.D. Pa., filed Dec. 14, 2017)............................................*passim*

*Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*,

No. 16-17483, 2017 U.S. App. LEXIS 9904 (11th Cir. June 5, 2017).........................12

*Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*,

342 U.S. 180 (1952).......................................................................20

*Knievel v. ESPN*,

393 F.3d 1068, 1076 (9th Cir. 2005) ...................................................2

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*,

787 F.3d 1237 (9th Cir. 2015) ....................................................21, 22

*Lutz Appellate Servs. v. Curry*,

859 F. Supp. 180 (E.D. Pa. 1994) .....................................................12

*Luviano v. Multi Cable, Inc.*,

No. 15-05592, 2017 U.S. Dist. LEXIS 32349 (C.D. Cal. Jan. 3, 2017) ....................2

*Marder v. Lopez*,

450 F.3d 445 (9th Cir. 2006) ..........................................................3

*Mauthe v. Nat'l Imaging Assocs.*,

No. 17-1916, 2018 U.S. Dist. LEXIS 72906 (E.D. Pa. Apr. 25, 2018),

*appeal filed*, No. 18-2119 (3d Cir., May 18, 2018) ...................................*passim*

*Mauthe v. Optum, Inc.*,

No. 17-1643, 2018 U.S. Dist. LEXIS 125796 (E.D. Pa. July 27, 2018),

*appeal filed*, No. 18-2894 (3d Cir., Aug. 24, 2018).....................................11, 16, 17

*Mims v. Arrow Fin. Servs., LLC*,

565 U.S. 368 (2012)......................................................................1

*N.B. Industries, Inc. v. Wells Fargo & Co.*,

No. 10-03203, 2010 WL 4939970 (N.D. Cal. Nov. 30, 2010), *aff'd*,

- vi -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

465 F. App'x 640 (9th Cir. 2012) ........................................................ *passim*

*Pac. Rollforming, LLC v. Trakloc N. Am., LLC,*

   No. 07cv1897, 2010 U.S. Dist. LEXIS 60756 (S.D. Cal. June 18, 2010) ................................. 10

*Pacesetter Sys. v. Medtronic, Inc.,*

   678 F.2d 93 (9th Cir. 1982) ........................................................ 20

*Parrino v. FHP, Inc.,*

   146 F.3d 699 (9th Cir. 1998) ........................................................ 3

*PETA, Inc. v. Beyond the Frame, Ltd.,*

   No. 10-07576, 2011 WL 686158 (C.D. Cal. Feb. 16, 2011) ................................. 21

*Phillips Randolph Enters., L.L.C. v. Adler-Weiner Research Chi., Inc.,*

   526 F. Supp. 2d 851 (N.D. Ill. 2007) ................................. 11, 12, 15, 18

*Ross v. U.S. Bank Nat'l Ass'n,*

   542 F. Supp. 2d 1014 (N.D. Cal. 2008) ................................. 20, 21

*Sandusky Wellness Ctr., LLC v. Medco Health Solutions, Inc.,*

   788 F.3d 218 (6th Cir. 2015) ................................. 16, 17, 19

*Scharff v. Raytheon Co. Short Term Disability Plan,*

   No. 07-134, 2007 WL 2947566 (C.D. Cal. June 22, 2007) ........................................................ 10

*In re Silicon Graphics Inc. Sec. Litig.,*

   183 F.3d 970 (9th Cir. 2002) ........................................................ 3

*Supply Pro Sorbents, LLC v. RingCentral, Inc.,*

   2017 U.S. Dist. LEXIS 214838 (N.D. Cal. July 17, 2017), *aff'd,*

   743 F. App'x 124 (9th Cir. 2018) ........................................................ 13

*United States v. Ritchie,*

   342 F.3d 903 (9th Cir. 2003) ........................................................ 3

**Statutes**

47 U.S.C. § 227(a)(5) ................................. 11, 15, 17

- vii -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

47 U.S.C. § 227(b)(1)(C) .................................................................................... 1, 11

*In re the Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ........................ 11

*Junk Fax Prevention Act of 2005*, 21 F.C.C.R. 3787 (April 6, 2006) .............................................. 11

**Other Authorities**

47 C.F.R. § 64.1200(f)(15) ........................................................................................ 11

71 Fed. Reg. 25967-01, *25,973 (May 3, 2006) ........................................................... 13

Fed. R. Civ. P. 8(a)(2) ................................................................................................. 9

Fed. R. Civ. P. 12(b)(6) .................................................................................. 1, 3, 8, 9

Fed. R. Evid. 201(b) ...................................................................................................... 2

- viii -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

Defendant The Olson Research Group, Inc. ("Olson") submits this Brief in support of its motion to dismiss the claims of Plaintiffs Acutecare Health System, LLC ("Acutecare") and Retina Associates Medical Group, Inc. ("Retina") pursuant to Federal Rule of Civil Procedure 12(b)(6) or to stay, transfer, or dismiss this action based on the first-filed rule.

## PRELIMINARY STATEMENT

The Telephone Consumer Protection Act of 1991 (the "TCPA"), as amended by the Junk Fax Prevention Act of 2005, was passed in response to "[v]oluminous consumer complaints about abuses of telephone technology." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012). The TCPA, however, is narrow, and does not apply to all unsolicited communications. The facsimile is an important communication tool and Congress in no way intended to bar legitimate business communications made through facsimile. The statute thus applies only to unsolicited *advertisements*. 47 U.S.C. § 227(b)(1)(C).

In recent years, plaintiffs have attempted to distort the TCPA beyond comprehension, bringing baseless lawsuits arising out of faxes that do not advertise any goods or services. These frivolous claims not only waste judicial resources, they discourage businesses from using a legitimate technology to make useful communications, putting them at risk of defending lawsuits that, while baseless, raise the specter of catastrophic damage awards. If claims like this are permitted to proceed, the only prudent course for businesses is to either (1) cease these legitimate communications in their entirety or (2) pay extraordinary additional costs to use the United States mail, taking technology back nearly half a century.

Olson is a marketing and consulting firm that helps companies develop new products and services. One of the main ways Olson provides this advice is through conducting market research studies. Olson serves a variety of industries, including the pharmaceutical and healthcare industry. Olson's clients are pharmaceutical and

- 1 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

medical-device companies, not medical providers like Plaintiffs.  Olson does not sell anything to medical providers.

Acutecare originally brought an identical suit against Olson in the federal district court for the District of New Jersey in August 2018 alleging the same TCPA violations it does here (the "New Jersey case").  *See* **Exhibit 1** (attaching Acutecare's New Jersey complaint against Olson).[1]  After Olson moved to dismiss, Acutecare voluntarily dismissed its New Jersey case and re-filed it here in the Central District of California, adding Retina as a co-plaintiff.

---

[1]     Federal Rule of Evidence 201(b) permits the Court to take judicial notice of a document filed in another court to establish the fact of such litigation and related filings.  *See, e.g., Luviano v. Multi Cable, Inc.*, 2017 U.S. Dist. LEXIS 32349, at *11-13 (C.D. Cal. Jan. 3, 2017) (taking judicial notice of court documents from another case under Federal Rule of Evidence 201(b) because the "court documents at issue are the matters in the public record.  Thus, these documents are proper subjects for judicial notice.").  And courts may consider matters of public record on a motion to dismiss.  *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2001).

Furthermore, the Court can consider the fax Olson sent Acutecare on May 30, 2018 on this motion to dismiss without converting it into one for summary judgment because the May 30, 2018 fax is referenced in the Complaint and Acutecare's claims are predicated on it.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (The "incorporation by reference doctrine…permits [the court] to take into account [on a motion to dismiss] documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.  We have extended the [] doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.") (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 2002); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998)) (quotations omitted).  "The court may treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'"  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

- 2 -

DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE

Case No. 8:18-cv-01997-DOC-KES

1   Acutecare's allegations in this case are identical to those alleged in the New

2   Jersey case, which both arise out of a single fax dated May 30, 2018, a portion of

3   which was attached to its New Jersey complaint (the "Acutecare Fax").[2]   Olson sent

4   the Acutecare Fax to get feedback as part of the "DECART study, a randomized

5   controlled trial to assess the clinical evaluation and management of pharmacotherapy

6   regimens and whether a diagnostic test impacts clinical care decisions." *See* **Exhibit**

7   **1**.   The Acutecare Fax is not an advertisement.   It does not promote any goods or

8   services, nor does Olson even offer any services that Acutecare could purchase.

9   Quite the contrary:   the Acutecare Fax offered to *pay* recipients, like Dr. Lebowitz,

10   for participating in the study.   In this jurisdiction, an informational fax is not

11   actionable under the TCPA.   This action should be dismissed.

12   Retina's allegations in this case are mirror images of Acutecare's except Retina

13   alleges it received two faxes from Olson dated August 9, 2017 and October 3, 2017,

14   respectively (the "Retina Faxes").   The content of the Retina Faxes is remarkably

15   similar to the Acutecare Fax in that Olson also offered to pay the Retina recipient for

16   participating in a research study.   *See* **Exhibit 2** (attaching the August 9, 2017 Retina

17   Fax).   Like the Acutecare Fax, the Retina Faxes are not advertisements actionable

18   under the TCPA.

19   The first-filed rule provides an independent basis on which this Court should,

20   at a minimum, dismiss, stay, or transfer this action to the United States District Court

21   for the Eastern District of Pennsylvania.   The allegations here are virtually identical

22   to a matter pending there before District Judge Gerald J. Pappert, *Fischbein v. The*

23   *Olson Research Group, Inc.*, No. 17-05601 (E.D. Pa., filed Dec. 14, 2017).   Indeed,

24   ***Acutecare and Retina are encompassed within the putative class as pleaded in the***

25   _____

26   [2]      Acutecare did not attach the complete fax to its New Jersey complaint; instead,
it attached the first page of a two page fax.   *See* **Exhibit 1** at p.11 (Ex. A to New

27   Jersey complaint).

28                                            - 3 -
_____
**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**
Case No. 8:18-cv-01997-DOC-KES

*Fischbein case, and the class definition in the Fischbein case is virtually identical to the class definition in this case.*   Thus, for reasons of comity and judicial economy, the Court should, at a minimum, dismiss, stay, or transfer this action in favor of the first-filed action pending in the Eastern District of Pennsylvania.

## RELEVANT FACTUAL ALLEGATIONS

Olson is a full-service marketing research firm, specializing in healthcare, consumer, and agricultural research.  *See* www.olsonresearchgroup.com (last visited February 5, 2019).

Plaintiffs' lawsuit is based entirely on three faxes Olson sent to Dr. Robert Ruper on August 9, 2017, and October 3, 2017, and to Dr. Howard Lebowitz on May 30, 2018, respectively, which sought these physicians' participation in research surveys.  *See* **Exhibits 1-2** (collectively, the "Faxes").  The Acutecare Fax sought Dr. Lebowitz's feedback in the "DECART study, a randomized controlled trial to assess the clinical evaluation and management of pharmacotherapy regimens and whether a diagnostic test impacts clinical care decisions."  **Exhibit 1**.  Likewise, the Retina Faxes sought Dr. Ruper's feedback in an online survey regarding his "perceptions of interactions with manufacturers in the ophthalmology market."  **Exhibit 2**.  In the Complaint, Acutecare and Retina describe Drs. Ruper and Lebowitz (the "Doctors") as their "representative[s]," but they do not elucidate upon the relationship.[3]  (Compl. ¶¶ 13, 24.)

The Faxes includes the name and fax numbers of the Doctors at the top and articulates their purpose right up front.  For example, the Acutecare Fax states:

> You are invited to participate in the DECART study, a randomized controlled trial to assess the clinical evaluation and management of pharmacotherapy regimens and whether

---

[3]   If the Court does not dismiss this action for the reasons asserted herein, Olson reserves its right to move to dismiss this action on Article III standing grounds because the Faxes were directed to Drs. Ruper and Lebowitz and not the named Plaintiffs.

- 4 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

a diagnostic test impacts clinical care decisions.  The study is conducted by academic researchers and QURE Healthcare, and sponsored by Aegis Corporation.  Up to 225 primary care physicians will be recruited to participate. Findings from this national study could contribute to improved patient care quality.  Results are expected to be written and submitted to a national journal for publication.

**Exhibit 1.**  Similarly, at least one of the Retina Faxes states:

We are trying to understand your perceptions of interactions with manufacturers in the ophthalmology market by reaching out to a selected group of physicians of feedback. We request you to complete a 15 minute online survey that would help us understand this.  Your participation would be extremely valuable in improving support services for ophthalmic conditions.

**Exhibit 2** (emphasis omitted).  Both Faxes offers to *pay* the Doctors compensation for the time it takes to complete the study (*i.e.*, the Acutecare Fax offers to pay Dr. Lebowitz $400, and the August 9, 2017 Retina Fax offers to pay Dr. Ruper $150).

**Exhibits 1-2.**  There is no reference anywhere in the Faxes to services Olson sells or could sell to providers such as Plaintiffs (or anyone else), nor is there any request that Plaintiffs or the Doctors pay anything *to Olson*.  The Faxes then list a website (www.olsononlinesystems.com) and login information should the Doctors decide to participate in the surveys.  *Id*.  The Faxes specifically note that they are directed to the Doctors and not to anyone else.  *Id*.

Thus, as is apparent from the face of the Faxes, Olson is not seeking to sell any goods or services to the Doctors or Plaintiffs.  They simply seek the Doctors' participation in research studies within their areas of specialization.  Nevertheless, Plaintiffs, trying to turn these Faxes into an unwarranted payday, bring two causes of action under the TCPA, seeking to represent a nationwide class of similarly-situated fax recipients:

/ / /

/ / /

/ / /

- 5 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

1
2
3

> All persons within the United States who did not have an established business relationship with Defendant and who received any unsolicited advertisement from Defendant's telephone facsimile machine or its agent/s and/or employee/s to said person's telephone facsimile machine, within the four years prior to the filing of the Complaint.

4 (Compl. ¶ 35.)

5 ## RELEVANT PROCEDURAL BACKGROUND

6      Plaintiffs filed their Complaint on November 8, 2018. (Doc. No. 1.) The

7 substance of Plaintiffs' allegations—that they received an unsolicited facsimile in

8 violation of the TCPA—is the same as the plaintiff's allegations in a case filed in

9 December 2017 in the United States District Court for the Eastern District of

10 Pennsylvania, *Fischbein v. The Olson Research Group, Inc.*, No. 17-05601 (E.D. Pa.,

11 filed Dec. 14, 2017). *See* **Exhibit 3** (attaching a copy of the *Fischbein* complaint).[4]

12 ***Indeed, the class definitions in the Fischbein case and this case are nearly***

13 ***identical.***

14      In *Fischbein*, the plaintiff alleged that he received an unsolicited facsimile

15 containing an invitation to participate in a market-research study, purportedly in

16 violation of the TCPA. *Id.* at ¶¶ 2-4. Like the Faxes here, the *Fischbein* fax: (i)

17 offered to compensate Dr. Fischbein for his time to participate in the study; (ii) did

18 not offer anything for sale to Dr. Fischbein; (iii) specifically states that "*this study is*

19 *for marketing research only and not for any sales or marketing purpose;*" (iv) assures

20 Dr. Fischbein that his "identity will be kept strictly confidential, and the information

21 [he] provide[s] will only be passed on to our client anonymously and in the

22 aggregate;" (v) provides a toll-free number if Dr. Fischbein has any questions about

23 the survey; and (vi) concludes by thanking Dr. Fischbein for his consideration and

24 includes a toll-free number and website for Dr. Fischbein to use if he would like to

25 opt-out from future study invitations. *Id.* at Ex. A. As here, Dr. Fischbein asserted a

26
27

---

[4]      The Court can properly consider the *Fischbein* complaint on a motion to dismiss. *See* Footnote 1, *supra*.

28

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

putative class action for violation of the TCPA on behalf of the following:

> Each person sent one or more telephone facsimile messages after December 13, 2013 from "Olson Research Group" inviting them to participate for payment or compensation in a "marketing research study" through the website www.olsononlinesystems.com

*Id*. at ¶ 28.  ***Crucially, the Faxes at issue here are encompassed by the proposed class definition in Fischbein.***

Olson moved to dismiss the *Fischbein* complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* **Exhibit 4** (attaching a true and complete copy of the docket in *Fischbein*).  Judge Pappert heard argument on the motion on July 2, 2018.  *See* **Exhibit 5** (attaching a true and complete copy of the oral argument hearing in *Fischbein*).[5]

During argument, Judge Pappert noted that many of the issues raised in the *Fischbein* case were similar to those raised in *Mauthe v. Nat'l Imaging Assocs.*, No. 17-1916, 2018 U.S. Dist. LEXIS 72906 (E.D. Pa. Apr. 25, 2018), where Chief Judge Stengel granted a motion to dismiss on the basis that the underlying facsimile was not an advertisement or pretext for an advertisement.  The *Mauthe* case is currently on appeal before the United States Court of Appeals for the Third Circuit, *Mauthe v. National Imaging Assocs.*, No. 18-2119 (3d Cir., filed May 18, 2018).  As Judge Pappert noted, if the district court decision is affirmed, it would likely be difficult for the Plaintiff in *Fischbein* to survive a motion to dismiss.  *See* **Exhibit 5** at p.4.  Thus, that day, Judge Pappert entered an order placing the *Fischbein* matter on the civil suspense docket pending a decision by the Third Circuit in *Mauthe*.  *See* **Exhibit 4** at Doc. No. 19.

/ / /

/ / /

---

[5]     The Court can properly consider the *Fischbein* docket and hearing transcript on a motion to dismiss.  *See* Footnote 1, *supra*.

- 7 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

## **ARGUMENT**

## **I.   PLAINTIFFS FAIL TO STATE A CLAIM FOR A TCPA VIOLATION**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And, although this Court must accept all well-pleaded facts as true and draw reasonable inferences in favor of the plaintiff, it need not accept, without more, legal conclusions masquerading as facts. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In addition, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). To state a plausible claim, a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

It is plain from the face of the Faxes that they are *not* an advertisement under the TCPA.[6] *First*, the Faxes do not seek to sell Plaintiffs any goods or services; they

---

[6] The Court may properly consider the Faxes on a motion to dismiss because they are referenced in and integral to Plaintiffs' claims in the Complaint. *See* Footnote 1, *supra; see also Scharff v. Raytheon Co. Short Term Disability Plan*, 2007 WL 2947566, at *9-10 (C.D. Cal. June 22, 2007) ("Here, because Paragraph 13 of the Complaint refers to and quotes from the SPD, under the incorporation by reference doctrine, the Court may properly consider Exhibit 1. Additionally, even if the Complaint did not refer to the SPD, the Court could still properly consider it since the SPD document is integral to Scharff's claims, and Scharff does not dispute its authenticity."); *Pac. Rollforming, LLC v. Trakloc N. Am., LLC*, 2010 U.S. Dist. LEXIS 60756, at *21 (S.D. Cal. June 18, 2010) (considering notice of rescission attached to defendants' motion to dismiss, because "even where the complaint does

- 8 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

1  simply request information and feedback in the form of participating in a research

2  study.  *Second*, the Faxes are not a "pretext" for future advertising.  The mere

3  mention of a website as a method to complete the survey does not make the survey an

4  advertisement, particularly since there is nothing offered for sale to the Plaintiffs on

5  that website.  The Faxes therefore cannot constitute an "unsolicited advertisement"

6  under the TCPA.

7  **A. The TCPA Prohibits Only "Unsolicited *Advertisements*."**

8         The TCPA makes it "unlawful for any person within the United States . . . to

9  use any telephone facsimile machine . . . to send, to a telephone facsimile machine, an

10 unsolicited *advertisement*."  47 U.S.C. § 227(b)(1)(C) (emphasis added).  The TCPA

11 defines an "unsolicited advertisement" as "any material advertising the commercial

12 availability or quality of any property, goods, or services which is transmitted to any

13 person without that person's prior express invitation or permission, in writing or

14 otherwise."  *Id.* at § 227(a)(5); *see also* 47 C.F.R. § 64.1200(f)(15).  An

15 advertisement is any material that promotes the sale (typically to the public) of any

16 property, goods, or services available to be bought or sold so some entity can profit –

17 the message must "promote a commercial product or service."  *Phillips Randolph*

18 *Enters., L.L.C. v. Adler-Weiner Research Chi., Inc.*, 526 F. Supp. 2d 851, 852 (N.D.

19 Ill. 2007) (citing to *In re the Rules & Regulations Implementing the Tel. Consumer*

20 *Prot. Act of 1991; Junk Fax Prevention Act of 2005,* 21 F.C.C.R. 3787, at 3810 (April

21 6, 2006)).  By contrast, under the TCPA, faxes that simply provide and collect

22 information are *not* advertisements.  *See ARcare v. IMS Health, Inc.*, 2016 U.S. Dist.

23 LEXIS 125262, at *12 (E.D. Ark. Sep. 15, 2016) (fax verifying contact information

24 not an advertisement); *Mauthe v. Optum, Inc.*, 2018 U.S. Dist. LEXIS 125796, at *2

25 (E.D. Pa. July 27, 2018) (same), *on appeal*, No. 18-2894 (3d Cir., filed Aug. 24,

26
27 not explicitly refer to the document, but the document is integral to the complaint and
   the document's authenticity is not disputed, the document may be considered.").

28
- 9 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

2018).

Whether a fax constitutes an advertisement under the TCPA is a question of law. *N.B. Industries, Inc. v. Wells Fargo & Co.*, 2010 WL 4939970, at *11 (N.D. Cal. Nov. 30, 2010), *aff'd*, 465 F. App'x 640 (9th Cir. 2012). Therefore, courts routinely dismiss TCPA actions at the motion to dismiss stage where, as here, it is clear from the face of the fax that it is not an advertisement. *See, e.g.*, *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 2017 U.S. App. LEXIS 9904 (11th Cir. June 5, 2017) (affirming grant of motion to dismiss where fax at issue was not an advertisement as a matter of law); *Lutz Appellate Servs. v. Curry*, 859 F. Supp. 180, 182 (E.D. Pa. 1994) (same).

Communications that provide, verify, or collect information are not advertisements under the TCPA because they do not promote the sale of property, goods, or services. *E.g.*, *N.B. Industries*, 2010 WL 4939970, at *2 (fax containing information about and applications for Asian business leadership award was not an advertisement); *see also Mauthe*, 2018 U.S. Dist. LEXIS 72906, at * 5-6 (facsimile seeking feedback on a transaction is not an advertisement).

Courts also have found that research surveys or trials offered in exchange for compensation do not qualify as advertisements under the TCPA. *See Davis Neurology, P.A. v. BSM DoctorDirectory.com, LLC*, 2017 U.S. Dist. LEXIS 61469, at *8 (E.D. Ark. Mar. 20, 2017) (fax inviting recipients to participate in market survey in exchange for cash not an "unsolicited advertisement" under the TCPA), *rev'd on other grounds,* 896 F.3d 872 (8th Cir. 2018); *Phillips Randolph Enters.*, 526 F. Supp. 2d at 853 (invitation to participate in a research study not an advertisement); *Ameriguard, Inc. v. Univ. of Kan. Med. Ctr. Research Inst.*, 2006 WL 1766812, at *3 (W.D. Mo. June 23, 2006) (fax seeking participants in clinical research trial not an

- 10 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

1   "unsolicited advertisement" under the TCPA.[7]

2   On two occasions, the Ninth Circuit has considered whether a fax constitutes

3   an advertisement under the TCPA. In both instances, the Circuit answered that

4   question in the negative and affirmed dismissal of plaintiffs' TCPA claims. In *Supply*

5   *Pro Sorbents, LLC v. RingCentral, Inc*., 743 F. App'x 124, 124 (9th Cir. 2018), the

6   defendant operated an online service that allowed customers to send faxes using a

7   cover sheet that included the one-line statement: "Send and receive faxes with

8   RingCentral, www.ringcentral.com, RingCentral®." The district court dismissed the

9   plaintiff's TCPA claim, even though the one line did promote defendant's services,

10  because it was of "*de mininis* size" and "FCC Rules and Regulations state that 'a

11  reference to a commercial entity does not by itself make a message a commercial

12  message.'" *Supply Pro Sorbents, LLC v. RingCentral, Inc*., 2017 U.S. Dist. LEXIS

13  214838, at *5-6 (N.D. Cal. July 17, 2017) (citing FCC Rules and Regulations*,* 71

14  Fed. Reg. 25967-01, *25,973 (May 3, 2006)). The Ninth Circuit affirmed, finding the

15  one-line identifier was an "incidental advertisement" that did not convert the entire

16  fax into an advertisement. *Supply Pro Sorbents,* 743 F. App'x at 125.

17  More instructively, in *N.B. Industries, Inc. v. Wells Fargo & Co.*, 465 F. App'x

18  640, 642 (9th Cir. 2012), the Ninth Circuit addressed faxes that invited applications

19  for an annual award sponsored by the United States Pan Asian American Chamber of

20  Commerce (USPAACC) and Wells Fargo Bank. The faxes also contained the award

21  application, included references to the defendants' logos and websites, and instructed

22  that applicants would have to sign publicity releases, allowing the defendants to use

23  their name and pictures in promotional materials. *See N.B. Industries*, 2010 WL

24  4939970, at *4-5. The award came with a $5,000 grant and would be presented to the

---

[7]   Olson has not located any cases in the Ninth Circuit that specifically consider whether research surveys or studies offering compensation for participation constitute advertisements under the TCPA.

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

winners at the CelebrAsian Business Opportunity Conference, for which there was a fee to attend, although attendance was not required to actually win the award. *Id*. at *5-6.

The district court granted the defendants' motion to dismiss after finding that the faxes were not advertisements. The court noted that the FCC had identified four categories of materials that did not count as unsolicited advertisements within the meaning of the TCPA, including "informational" materials and materials with "incidental or *de minimus* advertising." *Id*. at *14. In addition to finding that faxes' references to the defendants' websites and logos were incidental, the district court found the remainder of the faxes' content was informational and were "merely applications for an award." *Id*. at *21.

The district court highlighted several characteristics of the faxes which pointed towards them being informational. First, the court noted "[a]pplying is voluntary, no fee is required, and the award winner does not need to attend the annual conference to receive the award." *Id*. at *22. Second, the court observed that "unlike an advertisement soliciting customers for a product, the award here has selection criteria." *Id*. at *24. Third, the court explained that "offering a $5,000 award to be presented at a conference (where attendance is optional) is very different than [opportunities] that are really pretexts for advertisements." *Id*. at *23-24. The court likened the $5,000 award to cases where "participants in research studies [are] paid for their time and travel or receive honoraria." *Id*. at *25. Citing *Phillips Randolph* and *Ameriguard*, the court reasoned that just like the faxes in those cases offering payment for participation in surveys and research studies did not qualify as advertisements, neither did the fax seeking applicants to win the $5,000 award. *Id*. at *25-26. The court rejected the plaintiff's argument that the monetary award's "commercial benefit" transformed the faxes into ones that advertised a commercial transaction within the reach of the TCPA:

- 12 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

> The inquiry is not whether there is an ancillary commercial benefit to either party but instead is whether the message is an advertisement (or a pretext for an advertisement). Like the [survey and research study] examples in the preceding paragraph, the application for an award is not an advertisement because it is not "material advertising the commercial availability or quality of any property, goods, or services."

*Id*. at *26 (citing 47 U.S.C. § 227(a)(5)).

On appeal, the Ninth Circuit affirmed, agreeing with the district court that the faxes were "comprised almost entirely [of] information about [the award]," that "the award itself [was] not commercially available," and that the incidental advertisements (websites and logos) in the faxes were "insufficient to transform faxes that were largely permissible into prohibited communications." *N.B. Industries, Inc.*, 465 F. App'x at 642-43. Therefore, "the faxes sent by Wells Fargo and USPAACC to N.B. were not, overall, advertisements within the meaning of [TCPA and] faxing them without N.B.'s permission did not violate the Act." *Id*. at 643.

The Sixth Circuit has also explained the difference between an informational fax and an advertisement in *Sandusky Wellness Ctr., LLC v. Medco Health Solutions, Inc.*, 788 F.3d 218 (6th Cir. 2015). There, although the defendant, a pharmacy benefit manager, identified certain drugs and offered services such as "keeping and updating a list of medicines . . . that are available through a healthcare plan" in a fax, the court found that those drugs and services were not actually advertised for sale in the fax. *Id*. at 222. Rather, the faxes were "purely informational," sent "to inform [the recipient] what drugs its patients might prefer" based on the list of medications compiled by defendant on behalf of various health plan sponsors, not medical providers such as the plaintiff. *Id*. Thus, "[u]nder the Act's definition, and in everyday speak, [the faxes were] therefore not advertisements: They lack[ed] the commercial components inherent in ads." *Id*.

In a case similar to *Sandusky*, the Eastern District of Pennsylvania court

- 13 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

reached the same conclusion. *See Mauthe v. Optum, Inc.*, 2018 U.S. Dist. LEXIS 125796.[8]  In *Mauthe v. Optum, Inc.*, the defendants sent the challenged fax to a health-care provider in order to verify the provider's contact information for defendants' national database of healthcare providers. *Id.* at 4.  Defendants' database was a product that was purchased by third-parties, usually "organizations that manage a health care network and pay claims," but was not marketed to individual providers. *Id.* at 4-5. The court found that "unless they promote the sale of an item by drawing public attention to it, faxes sent in furtherance of indirect commercial solicitations or transactions with third parties are not unsolicited advertisements." *Id. at* \*11-12 (*citing* 47 U.S.C. § 227(a)(5)). The court further stated that "informational messages and surveys do not violate the TCPA" unless they are pretextual. *Id.* at 10. In the end, the court determined that "[t]he fax did not market the availability of a good or service, nor was it a pretext for a larger scheme to market the availability of a good or service. *Id.* at \*2 (granting motion for judgment on the pleadings).

If the faxes in *N.B. Industries*, *Sandusky,* and *Mauthe* were "purely informational," there can be no doubt that the Faxes at issue here are also informational. *Sandusky*, 788 F.3d at 222.  Nothing mentioned in the Faxes are "available to be bought or sold." *N.B. Industries*, 465 F. App'x at 643.  Indeed, there is no allegation in the Complaint that Olson "has [any] interest whatsoever in

---

[8]   This *Mauthe v. Optum, Inc.* case, although brought by the same plaintiff, is different from the *Mauthe* case discussed by Judge Pappert at oral argument in *Fischbein*. *Compare Mauthe v. Optum, Inc.*, 2018 U.S. Dist. LEXIS 125796 (E.D. Pa. July 27, 2018) (dealing with a fax seeking to verify plaintiff's information in defendants' database) *with Mauthe v. Nat'l Imaging Assocs.*, 2018 U.S. Dist. LEXIS 72906 (E.D. Pa. Apr. 25, 2018) (dealing with a faxed satisfaction survey).  Plaintiff Mauthe's claims were dismissed in both cases, and he is currently appealing both cases to the Third Circuit. *See Mauthe v. Optum, Inc.*, No. 18-2894 (3d Cir., filed Aug. 24, 2018); *Mauthe v. Nat'l Imaging Assocs.*, No. 18-2119 (3d Cir., filed May 18, 2018).

- 14 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

soliciting business from" medical providers, such as Plaintiffs. *Sandusky*, 788 F.3d at 222. Like the defendants in *Mauthe,* Olson sells its services not to medical providers like Plaintiffs, but rather to corporate clients, *i.e.*, pharmaceutical and medical-device companies. *Id.* Simply put, Plaintiffs "do[] not allege, nor do[] the fax[es] indicate where or how [any services are] available for purchase by the fax recipient[s]." *ARcare*, 2016 U.S. Dist. LEXIS 125262, at *8.

Importantly, all the distinctions the Ninth Circuit made with regard to the informational faxes in *N.B. Industries* can also be made here: (1) participation in the research surveys and studies detailed in the Acutecare and Retina Faxes is voluntary and no fee is required; (2) the Faxes explain on their face that the surveys and studies have selection criteria, and the Doctors will need to qualify to participate;[9] and (3) the fact that the Faxes offer monetary compensation **to the recipients** in exchange for their participation makes these Faxes akin to the informational faxes in *Phillips Randolph* and *Ameriguard*, which are not advertisements under the TCPA. Just because an ancillary commercial benefit is being offered to the Doctors does not transform these Faxes into a commercial advertisement within the reach of the TCPA. On this basis alone, Plaintiffs' TCPA claims should be dismissed.

**B. The Faxes Are Not a Pretext for Future Advertisements.**

The Faxes also are not a pretext for future advertisements. Although a "fax that does not blatantly promote a product or service on its face may nonetheless violate the TCPA if it is a precursor or pretext for a future advertising," courts have

---

[9]      The August 9, 2017 Retina Fax states that participation in the research study is being sought from a "selected group pf physicians" and that "You must qualify…to receive this honorarium. There will be a few preliminary questions to determine whether this study is a good fit for you." *See* **Exhibit 2**. Likewise, the Acutecare Fax reads that only "[u]p to 225 primary care physicians" will be recruited to participate in the DECART study and that "[t]here will be a few preliminary questions to determine whether this study is a good fit for you." *See* **Exhibit 1**.

- 15 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

1   also recognized that "an informational fax is not transformed into an advertisement
2   simply by directing recipients to a website full of incidental advertisements." *Davis*,
3   2017 U.S. Dist. LEXIS 61469, at *6-9.

4       For example, the Ninth Circuit in *N.B. Industries* examined a fax informing
5   recipients they could apply for an award, but which also included references to a
6   conference (for which attendees were charged a fee), as well as logos and slogans,
7   contact information for the organizations, and an express invitation for recipients to
8   visit two separate websites which, at the time, were "almost entirely an
9   advertisement." 465 F. App'x at 643. Affirming the lower court's dismissal of the
10  TCPA claim, the Ninth Circuit found that this additional advertising "constituted such
11  a small portion of the faxes as to be incidental to the award application" and "[s]uch
12  *de minimis* advertising is insufficient to transform faxes that were largely permissible
13  into prohibited communications." *Id.*

14      The reference to the survey website (www.olsononlinesystems.com) on the
15  Faxes here is even more innocuous than the website the Ninth Circuit dealt with in
16  *N.B. Industries*. First, there is no allegation that the web portal itself advertises
17  anything that Plaintiffs or the Doctors could buy.[10] Second, Plaintiffs do not allege
18  that Olson sells products and services to doctors like Drs. Ruper and Lebowitz
19  (because it does not). Olson cannot profit from Plaintiffs by directing the Doctors to
20  its survey web portal; indeed, Olson *loses* money if the Plaintiffs decide to participate
21  in the research survey. Thus, the Faxes cannot be a pretext for future advertisement.
22  *E.g.*, *Sandusky*, 788 F.3d at 222 (emphasizing that although the fax at issue called
23  certain medications and services to the chiropractor's attention, it did not "promote

---

[10]     Crucially, Olson's survey web portal is NOT the company's main website.
*Compare* Olson's survey web portal at www.olsononlinesystems.com *with* Olson's
company website at www.olsonresearchgroup.com. The survey web portal is simply
a one-page website with empty fields for a study number and password to complete
the survey, nothing more.

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

the drugs or services in a commercial sense" because the faxes were "not sent with hopes to make a profit, directly or indirectly, from [the chiropractor] or the others similarly situated").

Accordingly, because the Faxes are neither an advertisement nor a pretext for a future advertisement, Plaintiffs' TCPA claims fail as a matter of law.

## II.   IF THE COURT DOES NOT DISMISS THIS ACTION FOR FAILURE TO STATE A CLAIM, IT SHOULD BE DISMISSED, STAYED, OR TRANSFERRED PURSUANT TO THE "FIRST-FILED RULE."

This "first-filed rule" is a well-established doctrine based in comity requiring that when, as here, duplicative lawsuits are filed successively in two different federal courts, the court where the action was filed first has priority.  *Pacesetter Sys. v. Medtronic, Inc.*, 678 F.2d 93, 94 (9th Cir. 1982).  Under the first-filed rule, a court faced with the duplicative suit may dismiss, stay, or transfer the second suit.  *Id.* at 94-95; *see also Ross v. U.S. Bank Nat'l Ass'n*, 542 F. Supp. 2d 1014, 1020 (N.D. Cal. 2008).  As the Supreme Court long ago noted, the first-filed rule promotes "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952); *see also Alltrade, Inc. v. Uniweld Prods.*, 946 F.2d 622, 625 (9th Cir 1991) (citing *EEOC v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988) (noting that the rule "encourages sound judicial administration and promotes comity among federal courts of equal rank so as to exercise forebearance to avert conflicts and to avoid interference with the process of each other.")).

The first-filed rule is not limited to "mirror image" cases where the issues perfectly align.  *See EFG Bank Ag v. Lincoln Nat'l Life Ins. Co.*, 2017 U.S. Dist. LEXIS 220049, at *10 (C.D. Cal. June 8, 2010) ("[T]he first-to-file rule 'does not require identical parties or issues, so long as the actions are substantially similar or involve substantial overlap.'") (quoting *PETA, Inc. v. Beyond the Frame, Ltd.*, 2011 WL 686158, at *2 (C.D. Cal. Feb. 16, 2011)).  Rather, the critical inquiry of the first-

- 17 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

1   filed rule is whether the subject matter of the later-filed case substantially overlaps

2   with that of the earlier one.  *Id.*; *see also Kohn Law Grp., Inc. v. Auto Parts Mfg.*

3   *Miss., Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015) ("The issues in both cases also need

4   not be identical, only substantially similar."); *Cadenasso v. Metro. Life Ins. Co.*, 2014

5   WL 1510853, at *32 (N.D. Cal. Apr. 14, 2014) (finding first-filed rule to apply

6   because, *inter alia*, "both cases will turn on substantially similar issues"); *PETA, Inc.*

7   *v. Beyond the Frame, Ltd.*, 2011 WL 686158, at *4 (C.D. Cal. Feb. 16, 2011)

8   ("Courts in the Ninth Circuit have adopted a flexible approach in evaluating the

9   similarity of the parties and issues.").

10          Here, the first-filed rule applies and, at a minimum, supports a dismissal, stay,

11  or transfer of this action because, while the plaintiffs differ, the underlying allegations

12  (supposed violations of the TCPA) are virtually identical.   Olson is the same

13  defendant in both actions and the proposed class definitions overlap.  *Ross v. U.S.*

14  *Bank N.A.*, 542 F. Supp. 2d 1014, 1020 (N.D. Cal. 2008) ("In a class action, the

15  classes, and not the class representatives, are compared.").      Under such

16  circumstances, courts routinely find that the first-filed rule applies and transfers or

17  stays the later-filed action.  For example, in *Kohn Law*, the Ninth Circuit affirmed the

18  district court's use of the first-filed rule to stay a later-filed action in the Central

19  District of California because:

20                  Noatex and APMM are already in litigation in Mississippi
                    over the same funds Kohn Law seeks in this case.  Because
21                  Kohn Law stands in the shoes of Noatex, APMM's defenses
                    in the present case against Kohn Law would, at the least,
22                  substantially overlap with the issues in the Mississippi
                    interpleader action.   The question Kohn Law asks the
23                  Central District of California to resolve is at the "heart" of
                    the Mississippi interpleader action….If Noatex does not
24                  recover funds in the Mississippi interpleader action, Kohn
                    Law will likely have no claim to those funds.  And, if
25                  Noatex does recover funds in the Mississippi interpleader
                    action, Kohn Law will likely recover funds.  Not only does
26                  the present case involve substantially similar issues as the
                    Mississippi interpleader action, the present case involves
27                  *the issue* to be determined in the Mississippi interpleader

28

- 18 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**
**THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR**
**DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

action.

787 F.3d at 1241 (emphasis in original).  Just like in *Kohn Law*, the heart of the issue to be determined here – whether targeted faxes offering to pay for one's participation in a survey for research purposes qualify as "advertisements" under the TCPA – is already being considered by the Eastern District of Pennsylvania.  Moreover, ***the Plaintiffs here would be part of the very same class in the first-filed Fischbein action*** should that question be answered affirmatively and the case proceed to discovery.  The first-filed rule was designed to avoid intra-state conflicts and judicial duplication in situations just like this one.

If the Court does not dismiss this action as a matter of law, then it should exercise its discretion here and dismiss, stay, or transfer this action pursuant to the first-filed rule.

## CONCLUSION

A fax that promotes neither a product nor a service is not an advertisement.  Rather, entirely informational faxes, like the ones here, which offer to *pay* its recipients for participating in a survey, do not fall within the purview of the TCPA.  Plaintiffs' Complaint must be dismissed as a matter of law.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 19 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

Case No. 8:18-cv-01997-DOC-KES

1       Even if this action is not dismissed as a matter of law, comity and common

2   sense dictate that it should be dismissed, stayed, or transferred to the Eastern District

3   of Pennsylvania where a first-filed action alleging the same claims against the same

4   defendant on behalf of the same class is already pending.  Plaintiffs are already part

5   of the putative class in the *Fischbein* action.  Plaintiffs therefore should seek their

6   relief in that first-filed action.

7   Dated: February 7, 2019        BUCHANAN INGERSOLL & ROONEY LLP

8

9

10                    By: */s/ Kimberly Arouh*
                             KIMBERLY AROUH

11                             JASMINE WETHERELL
                             Attorneys for Defendant

12                             The Olson Research Group, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
- 20 -
**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR
DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**
Case No. 8:18-cv-01997-DOC-KES

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I certify that on the 7th of February, 2019, I filed the foregoing

4   DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS

    ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS
5
    THIS ACTION PURSUANT TO THE FIRST-FILED RULE with the Clerk of the
6
    Court for the United States District Court, Central District of California, Southern
7
    Division, by using the Court's CM/ECF system, which will send notifications of such
8
    filing to all counsel of record.
9

10  DATED:  February 7, 2019          BUCHANAN INGERSOLL & ROONEY LLP

11

12                                    By:  */s/ Kimberly Arouh*
                                          KIMBERLY AROUH
13                                        JASMINE WETHERELL
                                          Attorneys for Defendant
14                                        The Olson Research Group, Inc.

15

16
    4841-0135-6166, v. 3
17

18

19

20

21

22

23

24

25

26

27

28

- 21 -

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THIS ACTION PURSUANT TO RULE 12(b)(6) OR STAY, TRANSFER, OR DISMISS THIS ACTION PURSUANT TO THE FIRST-FILED RULE**

# EXHIBIT 1

JS 44 (Rev. 06/17)

Case 3:18-cv-12598-MAS-LHG   Document 1-2   Filed 08/09/18   Page 1 of 1 PageID: 12

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Acutecare Health System, LLC

## DEFENDANTS
The Olson Research Group, Inc.

**(b)** County of Residence of First Listed Plaintiff   Monmouth
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Bucks, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Ross Schmierer, Denittis Osefchen Prince, P.C. (856) 797-9951
Five Greentree Centre, 525 Route 73 N.
Marlton, NJ 08053

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA")
Brief description of cause:
Plaintiff alleges Defendant sent an unsolicited advertisement through facsimile to Plaintiff and class members.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE                                           DOCKET NUMBER

DATE
08/06/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/Ross Schmierer

**FOR OFFICE USE ONLY**

RECEIPT #           AMOUNT              APPLYING IFP                JUDGE              MAG. JUDGE

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis (SD-0016)
Ross H. Schmierer, Esq. (RS-7215)
525 Route 73 North, Suite 410
Marlton, New Jersey 08053
(856) 797-9951
sdenittis@denittislaw.com
rschmierer@denittislaw.com

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq.
*(Pro Hac Vice forthcoming)*
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
(800) 400-6808
ak@kazlg.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Acutecare Health System, LLC, | Case No.: |
| Plaintiff, | |
| v. | |
| The Olson Research Group, Inc., | **COMPLAINT** |
| Defendant. | |

### CLASS ACTION COMPLAINT

1.    Acutecare Health System, LLC ("Plaintiff"), brings this Complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of The Olson Research Group, Inc. ("Defendant") in negligently and/or intentionally sending an unsolicited advertisement to Plaintiff's facsimile machine, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"). Plaintiff alleges as follows upon personal knowledge as to itself and its own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by its attorneys.

2.    As Judge Easterbrook of the Seventh Circuit explained in a TCPA case, "The Telephone Consumer Protection Act … is well known for its provisions limiting junk-fax transmissions…" *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir. 2012).

1

## JURISDICTION AND VENUE

3.   This Court has federal question jurisdiction because this case arises out of violation of federal law. 47 U.S.C. §227(b); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2012).

4.   Venue is proper in the United States District Court for the District of New Jersey pursuant to 18 U.S.C. § 1391(b) because Defendant is subject to personal jurisdiction in the City of Oceanport, State of New Jersey because it conducts business is in the City of Oceanport, State of New Jersey.

## PARTIES

5.   Plaintiff is, and at all times mentioned herein was, located in the City of Oceanport, State of New Jersey.

6.   Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153 (39).

7.   Defendant is located in the City of Yardley, in the State of Pennsylvania.

8.   Defendant is, and at all times mentioned herein were, corporations and each was a "person," as defined by 47 U.S.C. § 153 (39).

9.   At all times relevant, Defendant conducted business in the State of New Jersey and in the City of Oceanport, within this judicial district.

## FACTUAL ALLEGATIONS

10.   On May 30, 2018, Defendant used Defendant's telephone facsimile machine to send an unsolicited advertisement to Plaintiff's facsimile machine. A true and accurate copy of the facsimile is attached hereto as **Exhibit A**.

11.   Defendant's telephone facsimile machine has the capacity (A) to transcribe text or images or both from paper into an electric signal and to transmit that signal over a regular

2

telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper, as defined by 47 U.S.C. § 227(a)(3).

12.   Defendant's May 30, 2018 advertisement attempted to solicit Plaintiff's representative to perform research work for Defendant in exchange for pay.

13.   This May 30, 2018 facsimile transmission was advertising the commercial availability for paid work to Plaintiff pursuant to 47 U.S.C. § 227(a)(5).

14.   Prior to May 30, 2018, Plaintiff did not have an established business relationship with Defendant.

15.   Prior to May 30, 2018, Plaintiff did not voluntarily communicated Plaintiff's facsimile number to Defendant.

16.   Prior to May 30, 2018, Plaintiff did not advertise its facsimile number for public distribution.

17.   Defendant did not provide a notice on the first page of the advertisement pursuant to 47 U.S.C. § 227(2)(D).

18.   Defendants calls forced Plaintiff and class members to pay for the costs of paper for unwanted and unsolicited advertisements from Defendant.

19.   The facsimiles from Defendant's telephone facsimile machine to Plaintiff's facsimile were unsolicited by Plaintiff and without Plaintiff's permission or consent.

20.   Plaintiff is informed and believes and hereupon alleges, that these facsimiles were made by Defendant or Defendant's agent, with Defendant's permission, knowledge, control and for Defendant's benefit.

21.   The unsolicited advertisements by Defendant, or its agent(s), violated 47 U.S.C. § 227(b)(1)(C).

3

## CLASS ACTION ALLEGATIONS

22.  Plaintiff brings this action on behalf of itself and on behalf of all others similarly situated (the "Class").

23.  Plaintiff represents, and is a member of the Class, consisting of:

All persons within the United States who did not have an established business relationship with Defendant and who received any unsolicited advertisement from Defendant's telephone facsimile machine or its agent/s and/or employee/s to said person's telephone facsimile machine, within the four years prior to the filing of the Complaint.

24.  Defendant and its employees or agents are excluded from the Class.  Plaintiff does not know the number of members in the Class, but believes the Class members number in the several hundreds, if not more.  Thus, this matter should be certified as a Class action to assist in the expeditious litigation of this matter.

25.  Plaintiff and members of the Class were harmed by the acts of Defendant in at least the following ways: Defendant, either directly or through its agents, illegally contacted Plaintiff and the Class members via their telephone facsimile machines by using Defendant's telephone facsimile machine, thereby causing Plaintiff and the Class members to incur certain charges for which Plaintiff and the Class members have to pay.  Plaintiff and the Class members were damaged thereby.

26.  This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of the Class, and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to modify or expand the Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

4

27. The joinder of the Class members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court. The Class can be identified through Defendant's records and/or Defendant's agents' records.

28. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to the Class predominate over questions which may affect individual Class members, including but not necessarily limited to the following:

    a.    Whether, within the four years prior to the filing of the Complaint, Defendant or its agents sent any unsolicited advertisements to the Class (other than to class members who had an established business relationship with Defendant) using a telephone facsimile machine;

    b.    Whether Plaintiff and the Class members were damaged thereby, and the extent of damages for such violation; and

    c.    Whether Defendant and its agents should be enjoined from engaging in such conduct in the future.

29. As a person who received at least one unsolicited advertisement from Defendant's telephone facsimile machine, Plaintiff is asserting claims that are typical of the Class. Plaintiff will fairly and adequately represent and protect the interests of the Class in that Plaintiff has no interests antagonistic to any member of the Class.

30. Plaintiff and the members of the Class have all suffered irreparable harm as a result of the Defendant's unlawful and wrongful conduct. Absent a class action, the Class will continue to face the potential for irreparable harm. In addition, these violations of law will be allowed to proceed without remedy and Defendant will likely continue such illegal conduct. Because of the size of the individual Class member's claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.

31. Plaintiff has retained counsel experienced in handling class action claims and claims involving violations of the Telephone Consumer Protection Act.

32. A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendant to comply with federal law. The interest of Class members in individually controlling the prosecution of separate claims against Defendant is small because the maximum statutory damages in an individual action for violation of privacy are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

33. Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

**FIRST COUNT**
**NEGLIGENT VIOLATIONS OF THE**
**TELEPHONE CONSUMER PROTECTION ACT (TCPA)**
**47 U.S.C. 227**

34. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

35. The foregoing acts and omissions of Defendant constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

36. As a result of Defendant's negligent violations of 47 U.S.C. § 227 et seq., Plaintiff is entitled to an award of $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

37. Plaintiff is also entitled to and seeks injunctive relief prohibiting such conduct in the future.

6

## SECOND COUNT
### KNOWING AND/OR WILLFUL OF THE TCPA
### <u>47 U.S.C. 227</u>

38.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

39.   It is clear this message sent by Defendant is an unsolicited advertisement intentionally sent to Plaintiff.

40.   The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

41.   As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227 et seq., Plaintiff is entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

42.   Plaintiff is also entitled to and seeks injunctive relief prohibiting such conduct in the future.

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiff and members of the class respectfully pray for the following relief:

A.   Certification of the class under Fed. R. Civ. P. 23;

B.   On the First Count, as a result of Defendant's negligent violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks: (i) $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B); and (ii) pursuant to 47 U.S.C. § 227(b)(3)(A), injunctive relief prohibiting such conduct in the future;

C.   On the Second Count, as a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b)(1), Plaintiff seeks: (i) $1,500.00 in statutory damages, for each and

7

every violation, pursuant to 47 U.S.C. § 227(b)(3)(B); and (ii) pursuant to 47 U.S.C. § 227(b)(3)(A), injunctive relief prohibiting such conduct in the future.

D.      Attorney's fees and costs; and

E.      Such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and all others similarly situated, demands a trial by jury on all questions of fact raised by the Complaint.

Dated: August 9, 2018

DeNITTIS OSEFCHEN PRINCE, P.C.

By:     s/ Ross H. Schmierer
        Ross H. Schmierer, Esq.
        525 Route 73 North, Suite 410
        Marlton, New Jersey 08053
        (T): (856) 797-9951
        rschmierer@denittislaw.com

8

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Dated:  August 9, 2018

**DeNITTIS OSEFCHEN PRINCE, P.C.**

By:      *s/ Ross H. Schmierer*
         Ross H. Schmierer, Esq.
         525 Route 73 North, Suite 410
         Marlton, New Jersey 08053
         (T): (856) 797-9951
         rschmierer@denittislaw.com

         *Attorneys for Plaintiff*

ADDITIONAL COUNSEL FOR PLAINTIFF

**HYDE & SWIGART**
Joshua B. Swigart, Esq. (CA SBN: 225557)
*(Pro Hac Vice forthcoming)*
2221 Camino Del Rio South, Suite 101
San Diego, CA 92108-3551
(T):  (619) 233-7770
josh@westcoastlitigation.com

9

# EXHIBIT A

May-2018  16:31    -- FROM                                                      Fax                    p.1



## Olson Research Group, Inc.
### Healthcare Marketing Research
### 23 Years of Industry Excellence

**To:    Dr. HOWARD LEBOWITZ**

Fax:    7329423595                        Date:  Wednesday, May 30, 2018

Re:    **$400 - DECART (Drug-Drug Interaction Effectiveness and Clinical Awareness Randomized Controlled Trial) Online Study**

You are invited to participate in the DECART study, a randomized controlled trial to assess the clinical evaluation and management of pharmacotherapy regimens and whether a diagnostic test impacts clinical care decisions. The study is conducted by academic researchers and QURE Healthcare, and sponsored by Aegis Corporation. Up to 225 primary care physicians will be recruited to participate. Findings from this national study could contribute to improved patient care quality. Results are expected to be written and submitted to a national journal for publication.

Participation will require approximately 2 hours of your time over a period of ~2 months as follows.

- **Round 1 Patient Case Administration (45-60 minutes):** all participants are asked to complete a brief questionnaire followed by 3 CPVs® (online patient cases).
- **Intervention - Educational Material Review (10-15 minutes):** if randomly selected to the intervention arm, you will be asked to view a brief educational webinar on a new diagnostic service.
- **Round 2 Patient Case Administration (45-60 minutes):** all participants will be asked to complete an additional 3 CPVs®(online patient cases).

CPVs describe typical patients you encounter in your daily practice and are not meant to be difficult for someone of your knowledge and experience. Each case takes approximately 15-20 minutes to complete and you have up to 7 days to complete each administration round online. You may complete cases at your convenience, revisiting your secure homepage as many times as needed to complete your assignment. All data will be saved at each logout and you may pick up where you left off. All case responses will be confidential and anonymous. No physician or practice names are used when reporting the results of the study.

Participants will receive a fair market value compensation of $400 for completing **both rounds** of this study. **Once you complete Round 1, you will receive $100 and the remaining balance of $300 after completion of Round 2.**

> *(Please note: There will be a few preliminary questions to determine whether this study is a good fit for you.)*
> 1)    Go to: www.olsononlinesystems.com
> 2)    Enter the following in the Study # box provided: **N874**
> 3)    Enter the following password: **cv8fa**

**Please note the above password is only for use by: Dr. HOWARD LEBOWITZ. If you are not the intended recipient of this invitation and you use the password to complete the survey, or if you complete the survey more than once, Olson Research Group will NOT use your data in our study and will NOT pay to you an honorarium. This password is NOT transferable. If you

[■]

# EXHIBIT 2

Aug 10 2017 10:46AM Robert F Ruper, M D /14633/470                    page 1

10-Aug-2017  01:04   -- FROM                         Fax                    p.1


Olson Research Group, Inc.

**To:  DR. ROBERT RUPER**
**Fax:** 7146337470                      **Date: Wednesday, August 9, 2017**

## 15-minute Survey on Ophthalmology
### Final Compensation Increase – Closing Today!

To log in:
www.olsononlinesystems.com?study=w286
Password: **D7N8SZXK**

-----------------------------------------------------------------------

This communication alerts you to an upcoming marketing research study of interest to your profession. This is not a solicitation or advertisement to sell you any product or service.

We are trying to **understand your perceptions of interactions with manufacturers in the ophthalmology market** by reaching out to a <u>selected group of physicians</u> for feedback. We request you to complete a <u>15 minute</u> **online survey** that would help us understand this. Your participation would be extremely **valuable in improving support services** for ophthalmic conditions.

As a token of appreciation of your time, we are offering a <u>fair market value compensation of **$150.00.**</u> You must qualify and complete to receive this honorarium.

There will be a few preliminary questions to determine whether this study is a good fit for you.

-----------------------------------------------------------------------

**The above password is only for use by: DR. ROBERT RUPER. If you are not the intended recipient of this invitation and you use the password to complete the survey, Olson Research Group will NOT use your data in our study and will NOT pay to you an honorarium. This password is NOT transferable. If you are on the List of Excluded Individuals/Entities (LEIE) at the time of participation, Olson Research Group Will NOT use your data in our study and will NOT compensate you. Thank you.**

Your identity will be kept strictly confidential, and the information you provide will only be passed on to our client anonymously and in aggregate.

You must qualify and complete this survey to receive this honorarium. Please allow 6 weeks for processing. If after this timeframe you have any questions regarding your remuneration, please call 267-352-4952 or email incentiveprocessing@olsonresearchoa.com with your inquiry.

If you have any questions, please call us toll-free at 1-888-799-5311 and mention the above referenced study. Thank you in advance for your consideration and continued interest in medical marketing research!

***Once we have reached our quota of participants, the study will close, so please log on as soon as possible and complete the interview****

Note: If you would like to be removed from this study and all future study invitation lists, please call toll free 877-281-6342 and enter PIN: 9958, or visit www.donotsend.net, select FAX, and enter PIN: 9958. Please note that requests may take up to one day to fully process.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. RICHARD E. FISCHBEIN, MD, individually and as the representatives of a class of similarly-situated persons, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) ) | CLASS ACTION |
| THE OLSON RESEARCH GROUP, INC. and John Does 1-12, | ) ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Dr. Richard E. Fischbein, MD ("Plaintiff"), brings this action on behalf of himself and all other persons similarly situated and, except for those allegations pertaining to Plaintiff or his attorneys, which are based upon personal knowledge, allege the following upon information and belief against defendants, The Olson Research Group, Inc. ("Olson") and John Does 1-12:

### PRELIMINARY STATEMENT

1.    Defendants have sent advertisements by facsimile in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, and the regulations the Federal Communications Commission ("FCC")

has prescribed thereunder, 47 C.F.R. § 64.1200 (collectively, the "TCPA").

    2.    Defendants sent Plaintiff at least one advertisement by facsimile and in violation of the TCPA. <u>Exhibit A</u>. Plaintiff did not expressly consent to receive any advertisement from Defendants by fax. Moreover, Plaintiff does not have an established business relationship with Defendants.

    3.    Plaintiff brings this action against Defendants on behalf of a class of all persons and entities that Defendants sent one or more telephone facsimile messages ("faxes") about Defendants' marketing focus group program, seeking statutory damages for each violation of the TCPA, trebling of the statutory damages if the Court determines Defendants' violations were knowing or willful, injunctive relief, compensation and attorney fees (under the conversion count), and all other relief the Court deems appropriate under the circumstances.

    4.    Defendants' unsolicited faxes damaged Plaintiff and the other class members. Unsolicited faxes tie up the telephone lines, prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the

2

recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message. The recipient of a "junk" fax loses the use of its fax machine while receiving an unsolicited fax transmission, and many lose their paper and ink toner in printing the fax. Such an unsolicited fax interrupts the recipient's privacy. A junk fax wastes the recipient's valuable time that would have been spent on something else.

5.     Defendants' fax advertises a marketing focus group program, a commercially available service. Exhibit A.

6.     Other information on Defendants' fax (Exhibit A) is mere pretext or subterfuge for evading the TCPA.

7.     Defendant Olson is a for-profit business.

8.     Defendant Olson's clients are companies in the healthcare industry, consulting firms, and other marketing research organization. Exhibit B ("Who are your clients?").

9.     Defendant Olson's Privacy Policy tells prospective survey participants, "The invaluable information and opinions you provide through market research surveys helps companies develop new

3

products and services, and modify existing ones to better suit your needs." Exhibit C ("Privacy Policy").

10.    Defendant Olson pays health professionals to participate in "surveys" and then packages the collected market research and other information for Defendants' clients.

## PARTIES, JURISDICTION, AND VENUE

11.    Plaintiff, Dr. Richard E. Fischbein, is a Pennsylvania resident and a physician specializing in psychiatry in a practice located in Kingston, Pennsylvania.

12.    On information and belief, Olson is a Pennsylvania corporation with its principal place of business in Yardley, PA.

13.    John Doe Defendants 1-12 are persons yet unknown to Plaintiff that actively participated in the transmission of fax advertisements to the class, or benefitted from those transmissions. When Plaintiff discovers their identities, he will seek leave to amend this complaint to add allegations regarding such person's activities and liabilities in this action.

14.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

4

15.   Personal jurisdiction exists over Defendant Olson in Pennsylvania because Defendant is a Pennsylvania corporation, has transacted business within the State, and has committed tortious acts within the State.

16.   Venue is proper in the Eastern District of Pennsylvania because Defendant Olson is located within this District, committed statutory torts within this District, and a significant portion of the events took place here.

## FACTS

17.   Defendants sent advertisements by facsimile to Plaintiff and a class of similarly-situated persons. Whether Defendants did so directly or with the assistance of a third party (yet unknown to Plaintiffs), Defendants are directly liable for violating the TCPA.

18.   Plaintiff has received at least one of Defendants' advertisements by facsimile. A true and correct copy of the fax Plaintiff received on May 17, 2017 is attached as Exhibit A.

19.   Exhibit A is a one-page document Defendants sent by fax advertising $150 compensation to "participate in a 45 minute marketing research study. The fax also advertises the commercial availability of

5

Defendants' paid marketing survey program, through which Defendants plan to gather valuable market research and other information or opinions from health professionals for Defendants' clients.

20.   Exhibit A includes the following instructions:

1.   Go to: www.olsononlinesystems.com
2.   Enter the following in the Study # box provided: z1361
3.   Enter the following password: jpatsy

21.   If one goes to the hyperlink on Defendants' fax as instructed—https://www.olsononlinesystems.com—one   sees   the following "Welcome to Olson Online" page:

> *The Olson Research Group, Inc. is a full-service marketing research firm, specializing in healthcare, consumer and agricultural research. We offer all phases of qualitative and quantitative research solutions.*
>
> ***If you are responding to a current online study, please type the study number below and click Submit:***

Exhibit D.

22.   Once a fax recipient enters the study number, hyperlinks on the Welcome page for the Olson "Terms & Conditions" and "Privacy Policy" direct users to these web pages:

http://www.olsononlinesystems.com/confirmit/terms.png.

http://www.olsononlinesystems.com/privacy.php (Exhibit C).

6

23.    The   Frequently   Asked   Questions   section   of   Defendants'
website—found        at        http://www.olsonresearchgroup.com/contact/—
informs as follows:

Frequently Asked Questions

How large is your panel of healthcare providers?

Olson  Research  Group  does  not  offer  a  static  panel  of
respondents but instead harnesses a proprietary database
that  contains  ~2.4  million  unique  healthcare  provider
records, including 960,000 actively practicing physicians
with associated NPI, and ~60,000 nurses and other para-
professionals.  The  foundation  of  our  database,  which
serves  as  the  backbone  for  sourcing  records  as  well  as
ensures  the  accuracy  and  validity,  is  Olson's  exclusive
partnership with a healthcare database consortium that
assists  us  in  cross-checking  contact  information  (i.e.
name, phone/email, specialty) with industry sources, and
also  appends  details  such  as  NPI  numbers  and  other
relevant  targeting  information.  Data  is  imported  and
updated  on  a  weekly  basis.  In  conjunction  with  this
relationship, Olson has specialty validation procedures in
place for checking the accuracy of respondents during the
lifecycle  of  every  project  using  a  multi-step  process  to
ensure  we  are  providing  our  clients  with  strategically
profiled respondents for highly efficient fielding.

Exhibit E.

Who are your clients?

Olson is proud to have achieved one of the highest client
retention rates in the industry over the past 20+ years.
Our clients come from all dimensions of the healthcare
spectrum,  from  end-user  manufacturers,  to  consulting

7

firms and other marketing research organizations. We approach each project with a flexible and personalized approach to getting the right respondents and providing the insights they need to make fast decisions on their strategic goals. We are very proud that our reputation in the healthcare marketing research industry is such that we are considered the "go-to" firm when others are unable to satisfy a project's requirements.

Exhibit B.

24.   Exhibit A does not include a complaint mandatory opt-out notice required by 47 C.F.R. § 64.1200 (a) (4).

25.   Plaintiff did not expressly invite or give permission to anyone to send Exhibit A or any other advertisement from Defendants to Plaintiff's fax machine.

26.   On information and belief, Defendants sent advertisements by facsimile to Plaintiff and more than 39 other persons in violation of the TCPA.

27.   Plaintiff and the other class members owe no obligation to protect their fax machines from Defendants. Their fax machines are ready to send and receive their urgent communications, or private communications about patients' medical needs, not to receive Defendants' unlawful advertisements.

8

## CLASS ACTION ALLEGATIONS

28.   Plaintiff brings this action as a class action on behalf of himself and all others similarly situated as members of a class, initially defined as follows:

> Each person sent one or more telephone facsimile messages after December 13, 2013 from "Olson Research Group" inviting them to participate for payment or compensation in a "marketing research study" through the website www.olsononlinesystems.com.

Plaintiff anticipates modifying the proposed class definition, including proposing subclasses where appropriate, after discovery about the scope and breadth of Defendants' fax advertising program and will do so through an amended motion for class certification pursuant to Fed. R. Civ. P. 23.

29.   Excluded from the class are Defendants, any entity in which any Defendant has a controlling interest, each of Defendants' officers, directors, legal representatives, heirs, successors, and assigns, and any Judge assigned to this action, including his or her immediate family.

30.   In this action, Plaintiff intends to discover, include, and resolve the merits of claims about all advertisements Defendants sent by fax. Exhibit F, a Demand for Preservation of All Tangible Documents Including Electronically Stored Information.

9

31.    This action is brought and may properly be maintained as a class action pursuant to Fed. R. Civ. P. 23. This action satisfies Rule 23 (a)'s numerosity, commonality, typicality, and adequacy requirements. Furthermore, the questions of law or fact that are common in this action predominate over any individual questions of law or fact making class representation the superior method to adjudicate this controversy under Rule 23 (b) (3).

32.    **Numerosity/impracticality of joinder.** On information and belief, the class consists of more than 39 persons and, thus, is so numerous that individual joinder of each member is impracticable. The precise number of class members and their identities are unknown to Plaintiffs, but will be obtained from Defendants' records or the records of third parties.

33.    **Commonality and predominance.** There is a well-defined community of interest and there are common questions of law and fact that predominate over any questions affecting only individual members of the class. These common legal and factual questions, which do not vary from one class member to another, and which may be determined without reference to the individual circumstances of any class member,

10

include, but are not limited to the following:

    a.    Whether <u>Exhibit A</u> and other yet-to-be-discovered facsimiles sent by or on behalf of Defendants advertised the commercial availability or quality of any property, goods or services;

    b.    Whether Defendants were the senders of advertisements by facsimile;

    c.    The manner and method used to compile or obtain the list(s) of fax numbers to which Defendants sent the faxes at issue;

    d.    Whether the Court should award statutory damages to Plaintiff and the other class members;

    e.    If the Court finds that Defendants willfully or knowingly violated the TCPA, whether the Court should exercise its discretion to increase the amount of the statutory damages award to an amount equal to not more than three times the amount;

    f.    Whether the Court should enjoin Defendants from faxing advertisements in the future; and

    g.    Whether Defendants' conduct as alleged herein

11

constituted conversion.

34.   **Typicality of claims.** Plaintiff's claims are typical of the
claims of the other class members, because Plaintiff and all class
members were injured by the same wrongful practices. Plaintiff and the
members of the class received Defendants' advertisements by facsimile
and those advertisements did not contain the opt-out notice required by
the TCPA. Under the facts of this case, because the focus is upon
Defendants' conduct, if Plaintiff prevails on his claims, then the other
putative class members will prevail as well.

35.   **Adequacy of representation.** Plaintiff is an adequate
representative of the class because his interests do not conflict with the
interests of the class he seeks to represent. Plaintiff has retained
counsel competent and experienced in complex class action litigation,
and TCPA litigation in particular, and Plaintiff intends to vigorously
prosecute this action. Plaintiff and his counsel will fairly and
adequately protect the interest of members of the class.

36.   **Prosecution of separate claims would yield inconsistent
results.** Even though the questions of fact and law in this action are
predominantly common to Plaintiff and the putative class members,

12

separate adjudication of each class member's claims would yield inconsistent and varying adjudications. Such inconsistent rulings would create incompatible standards for Defendants to operate under if/when class members bring additional lawsuits concerning the same unsolicited fax advertisements or if Defendants choose to advertise by fax again in the future.

37. **A class action is the superior method of adjudicating the common questions of law or fact that predominate over individual questions.** A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all class members is economically unfeasible and procedurally impracticable. The likelihood of individual class members prosecuting separate claims is remote, and even if every class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the class would be proper. Plaintiff envisions no difficulty in the

13

management of this action as a class action.

## COUNT I
## TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

38.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

39.    Plaintiff brings Count I on behalf of himself and a class of similarly situated persons against Defendants.

40.    The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine...." 47 U.S.C. § 227 (b) (1).

41.    The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission."  47 U.S.C. § 227 (a) (4).

42.    Exhibit A advertises Defendants' commercially available marketing research program and offers to pay recipients for participating in marketing research conducted for Defendants' paying client(s). Exhibit A.

43.    By requiring fax recipients to go to its website at www.olsononlinesystems.com, Defendants' fax advertises Defendants'

14

"full-service marketing research and consulting firm that conducts a variety of market research surveys, both online and offline." Exhibit D.

44.    Defendants' website tells potential survey participants that their information and opinions are "invaluable." Exhibit C ("Privacy Policy").

45.    Olson's clients are "important decision makers in major corporations and organizations." Exhibit C ("Privacy Policy").

46.    Defendants sent Exhibit A to Plaintiff and the fax machines of other health professionals offering compensation for participation in marketing research.

47.    Through Exhibit A, Defendants intended to gather opinions and other valuable market research and information from paid participants and then provide that data to Defendants' clients in the healthcare industry.

48.    The TCPA provides a private right of action as follows:

   3.    Private right of action. A person may, if otherwise permitted by the laws or rules of court of a state, bring in an appropriate court of that state:

      (A)   An action based on a violation of this subsection or the regulations prescribed under   this   subsection   to   enjoin   such

15

violation,

(B)   An action to recover for actual
monetary loss from such a violation, or to
receive $500 in damages for each such
violation, whichever is greater, or

(C)   Both such actions.

47 U.S.C. § 227 (b) (3).

49.   The Court, in its discretion, may treble the statutory
damages if it determines that a violation was knowing or willful.  47
U.S.C. § 227 (b) (3).

50.   Here, Defendants violated 47 U.S.C. § 227 (b) (1) (C) by
sending advertisements by facsimile (such as Exhibit A) to Plaintiff and
the other class members without their prior express invitation or
permission.

51.   The TCPA requires that every advertisement sent by
facsimile must include an opt-out notice clearly and conspicuously
displayed on the bottom of its first page. 47 U.S.C. § 227 (b) (2) (D) and
(E); 47 C.F.R. § 64.1200 (a) (4).

52.   Here, Defendants violated 47 U.S.C. § 227 (b) (2) (D) and (E)
and 47 C.F.R. § 64.1200 (a) (4) (iii) & (v) by failing to include a
compliant opt-out notice. Exhibit A.

16

53.   Facsimile advertising imposes burdens on recipients that are distinct from the burdens imposed by other types of advertising. The required opt-out notice provides recipients the necessary information to opt-out of future fax transmissions, including a notice that the sender's failure to comply with the opt-out request will be unlawful. 47 C.F.R. § 64.1200 (a) (4) (iii).

54.   Exhibit A does not state that Defendants' failure to comply with an opt-out request within 30 days is unlawful.

55.   Exhibit A does not inform the recipient that he/she/it has a legal right to request that Defendants not send any future fax.

56.   Exhibit A does not inform the recipient that an opt-out request will be valid only unless and until the person making the request subsequently provides express invitation or permission to the sender, in writing or otherwise, to send such advertisement to such person at such telephone facsimile machine.

57.   The TCPA is a strict liability statute and Defendants are liable to Plaintiff and the other class members even if Defendants' actions were negligent. 47 U.S.C. § 227 (b) (3).

58.   If Defendants' actions were knowing or willful, then the

17

Court has the discretion to increase the statutory damages up to three
times the amount. 47 U.S.C. § 227 (b) (3).

59.   Defendant Olson is liable for the fax advertisements at issue
because it sent the faxes, caused the faxes to be sent, participated in the
activity giving rise to or constituting the violation, the faxes were sent
on its behalf, or under general principles of vicarious liability, including
actual authority, apparent authority and ratification.

60.   Defendant's actions damaged Plaintiff and the other class
members. Receiving Defendants' junk faxes caused the recipients to lose
paper and toner consumed in the printing of Defendants' faxes. The
subject faxes used the fax machines of Plaintiff and the other class
members. The subject faxes wasted Plaintiff's valuable time, requiring
receipt and review Defendants' unlawful fax. Defendants' faxes
unlawfully interrupted Plaintiff and the other class members' privacy
interests in being left alone. Finally, the injury and property damage
sustained by Plaintiff and the other class members from the sending of
unlawful fax advertisements occurred outside Defendants' premises.

WHEREFORE, Plaintiff, individually and on behalf of all others
similarly situated, demands judgment in his favor and against

18

Defendants, jointly and severally, as follows:

A.     That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.     That the Court award $500.00 in statutory damages for each violation of the TCPA;

C.     That, if it finds Defendants willfully or knowingly violated the TCPA's faxing prohibitions, the Court exercise its discretion to increase the amount of the statutory damages award to an amount equal to not more than 3 times the amount (Plaintiff requests trebling);

D.     That the Court enter an injunction prohibiting Defendants from violating the TCPA; and

E.     That the Court award costs and such further relief as the Court may deem just and proper.

## COUNT II
## CONVERSION

61.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

19

62.    Plaintiff brings Count II on behalf of himself and a class of similarly situated persons and against Defendants.

63.    By  sending  advertisements  to  their  fax  machines, Defendants  improperly  and  unlawfully  converted  the  class's  fax machines to Defendants' own use. Where printed (as in Plaintiff's case), Defendants  also  improperly  and  unlawfully  converted  the  class members' paper and toner to Defendants' own use. Defendants also converted Plaintiff's time to Defendants' own use, as it did with the valuable time of the other class members.

64.    Immediately  prior  to  the  sending  of  the  unsolicited  faxes, Plaintiff and the other class members each owned an unqualified and immediate right to possession of their fax machines, paper, toner, and employee time.

65.    By sending them unsolicited faxes, Defendants permanently misappropriated the class members' fax machines, toner, paper, and employee time to their own use. Such misappropriation was wrongful and without authorization.

66.    Defendants  knew  or  should  have  known  that  its misappropriation of paper, toner, and employee time was wrongful and

20

without authorization.

67.    Plaintiff and the other class members were deprived of the use of the fax machines, paper, toner, and employee time, which could no longer be used for any other purpose. Plaintiff and each class member thereby suffered damages as a result of their receipt of unsolicited fax advertisements from Defendants.

68.    Defendants' unsolicited faxes effectively stole Plaintiff's employees' time because persons employed by Plaintiff were involved in receiving, routing, and reviewing Defendants' illegal faxes. Defendants knew or should have known employees' time is valuable to Plaintiff.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demands judgment in his favor and against Defendants, jointly and severally, as follows:

A.    That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.    That the Court award damages;

C.    That the Court award punitive damages;

D.   That the Court award attorney's fees;

E.   That the Court award costs of suit; and

F.   That the Court award such further relief as it may deem just

and proper under the circumstances.

Respectfully submitted,

DR. RICHARD E. FISCHBEIN, individually
and as the representative of a class of
similarly-situated persons,

By:  /s/ Phillip A. Bock

Richard Shenkan (PA 79800)
Shenkan Injury Lawyer LLC
6550 Lakeshore St.
West Bloomfield, MI 48321429
Telephone: 248-562-1320
Facsimile: 888-769-1774
rshenkan@shenkanlaw.com

Phillip A. Bock (pro hac vice to be submitted)
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. La Salle St., Ste. 1000
Chicago, IL  60602
Telephone: 312-658-5500
Facsimile: 312-658-5555
service@classlawyers.com

22

# EXHIBIT A

17-May-2017  03:20  FROM                    Case 2:17-cv-05601-GJP   Document 1   Filed 12/14/17  Fax  Page 24 of 48                    p.1



## Earn $150.00 For Online Study RE: the Management of Disorders in Neurological Patients

### ATTN: DR. RICHARD FISCHBEIN

Fax:   5705523779                                        Date: Tuesday, May 16, 2017

This communication alerts you to an upcoming marketing research study of interest to your profession.  This is not a solicitation or advertisement to sell you any product or service.

We are looking to gain feedback from a selected group of specialists, like you, regarding **the management of disorders in neurological patients.** This study should take approximately 45 minutes to complete

For your time and opinions, we would like to present you with **A FAIR MARKET VALUE COMPENSATION OF:**

## $150.00

(Please note: There will be a few preliminary questions to determine whether this study is a good fit for you.)

| | |
|---|---|
| 1) | Go to:   www.olsononlinesystems.com |
| 2) | Enter the following in the Study # box provided: **z1361** |
| 3) | Enter the following password: **jpatsy** |

**\*\*Please note the above password is only for use by: _DR. RICHARD FISCHBEIN._** If you are not the intended recipient of this invitation and you use the password to complete the survey, if you complete the survey more than once, or if you are on the List of Excluded Individuals/Entities (LEIE) at the time of participation, Olson Research Group will NOT use your data in our study and will NOT compensate you. This password is NOT transferable.  Please allow 4-6 weeks for processing. If after this timeframe you have any questions regarding your remuneration, please call 1-267-352-4918.

Please be advised that this study is for marketing research only and not for any sales or marketing purpose.  Your identity will be kept strictly confidential, and the information you provide will only be passed on to our client anonymously and in aggregate.If you have any questions, please call us toll-free at 1-888-834-9799, and mention the above referenced study. Thank you in advance for your consideration and continued interest in medical marketing research!
\*Note: If you would like to be removed from this study and all future study invitation lists, please call toll free 877-281-6342 enter PIN: 9958 or visit www.donotsend.net, select FAX, and enter PIN: 9958.  Please note that requests may take up to one day to fully process.\*

# EXHIBIT B

# Olson Research Group, Inc.

HOME    ABOUT US    QUALITATIVE RESEARCH    QUANTITATIVE RESEARCH    INSIGHTS    **CONTACT**

REQUEST FOR PROPOSAL

HOME    ABOUT US    QUALITATIVE RESEARCH    QUANTITATIVE RESEARCH    INSIGHTS    **CONTACT**

REQUEST FOR PROPOSAL

# Contact Us

## PENNSYLVANIA HEADQUARTERS

1020 Stony Hill Road, Suite 200
Yardley, PA 19067
Tel: 267.487.5500
Email:
info@olsonresearchgroup.com

## CALIFORNIA OFFICE

225 East Bayshore Road, Suite 100
Palo Alto, CA 94303
Tel: 866.808.6690
Email:
info@olsonresearchgroup.com

## FEATURED INSIGHTS



ARE YOU A PHYSICIAN OR OTHER HEALTH CARE PROVIDER?

We invite you to add your name and contact information to our database.

HEALTHCARE PROFESSIONAL SIGNUP

...........................................................................................................................

# Get in Touch

Contact | Olson Research Group

http://www.olsonresearchgroup.com/contact/

Case 2:17-cv-05601-GJP   Document 1   Filed 12/14/17   Page 27 of 48

# Olson Research Group, Inc.

HOME     ABOUT US     QUALITATIVE RESEARCH     QUANTITATIVE RESEARCH     INSIGHTS     **CONTACT**

REQUEST FOR PROPOSAL

Research Interests/Needs

Additional Comments

VIEW +
Download >

**BECOME AN INSIGHTS INSIDER**

*Receive Insights Reports In Your Inbox*

Verification expired. Check the checkbox again.

I'm not a robot

reCAPTCHA
Privacy - Terms

email

SUBMIT

SUBMIT

# Frequently Asked Questions

## WHICH MARKETING RESEARCH SERVICES DO YOU SPECIALIZE IN?

## HOW LARGE IS YOUR PANEL OF HEALTHCARE PROVIDERS?

## WHICH THERAPEUTIC AREAS DO YOU SPECIALIZE IN?

# Olson Research Group, Inc.

HOME     ABOUT US     QUALITATIVE RESEARCH     QUANTITATIVE RESEARCH     INSIGHTS     **CONTACT**

REQUEST FOR PROPOSAL

RESEARCH?

## WHAT KIND OF ACCESS DO YOU HAVE IN THE PAYER COMMUNITY?

## DOES OLSON HAVE ACCESS TO KEY OPINION LEADERS?

## HOW QUICKLY ARE YOU ABLE TO COMPLETE PROJECTS?

## WHAT KIND OF EXPERIENCE DO YOUR PROJECT MANAGERS HAVE?

## WHO ARE YOUR CLIENTS?

Olson is proud to have achieved one of the highest client retention rates in the industry over the past 20+ years. Our clients come from all dimensions of the healthcare spectrum, from end-user manufacturers, to consulting firms and other marketing research organizations. We approach each project with a flexible and personalized approach to getting the right respondents and providing the insights they need to make fast decisions on their strategic goals. We are very proud that our reputation in the healthcare marketing research industry is such that we are considered the "go-to" firm when others are unable to satisfy a project's requirements.

CONTACT          FOLLOW                          INDUSTRY AFFILIATIONS

# Olson Research Group, Inc.

HOME   ABOUT US   QUALITATIVE RESEARCH   QUANTITATIVE RESEARCH   INSIGHTS   **CONTACT**

REQUEST FOR PROPOSAL

...u...y,...
19067
Tel:
267.487.5500

**California
Office**
2225 East
Bayshore
Road, Suite
100
Palo Alto, CA
94303
Tel:
866.808.6690

*A 2016*
EXPERT COMPANY
in
**Full Service Research**
*as seen in* QUIRK'S

*A 2017*
**TOP** COMPANY
*for*
**B2B Research**
*as seen in* QUIRK'S

*A 2017*
**TOP** COMPANY
*for*
**Pharmaceutical Research**
*as seen in* QUIRK'S

© 2017 Olson Research Group. All Rights Reserved.

# EXHIBIT C



lson Research Group, Inc.

Healthcare Marketing Research

ADD MY NAME TO YOUR DATABASE        PRIVACY POLICY        HELP

## The Olson Research Group, Inc. and Olson Online Systems Privacy Policy

The Olson Research Group is a full-service marketing research and consulting firm that conducts a variety of market research surveys, both online and offline. Online surveys are conducted over the Internet, while offline studies include telephone surveys, personal interviews and focus groups. We offer our online survey services through this website (http://www.olsononlinesystems.com/).

The home page for The Olson Research Group is http://www.olsonresearchgroup.com/.

### Data Uses

Olson Research Group's research activities provide participants with the opportunity to express opinions and attitudes about a variety of issues. We conduct research that involves people from around the world, in areas such as pharmaceutical/healthcare, consumer goods and services, animal health and agriculture. The invaluable information and opinions you provide through market research surveys helps companies develop new products and services, and modify existing ones to better suit your needs. We are commissioned by a wide variety of clients, including important decision makers in major corporations and organizations.

### Protecting Your Privacy

As a professional marketing research firm, protecting survey participants' privacy is an integral part of our business, both with our online and offline studies. The Olson Research Group will never sell your personally identifiable information to another party, nor use it for solicitation purposes. We use this information for internal purposes and share it only with our research partners in order to gather and analyze aggregated, anonymous survey results. We share information with our partners only in limited circumstances, specifically to allow our clients the ability to validate our work, or to use the data as an analytical aid.

Personal information will never be used to directly market products and services to our respondents unless this possibility has been disclosed at the outset of the research activity and consent has been obtained.

When we provide a client with survey results, they are aggregated with all other study participants and stripped of any personally identifiable information thus as a participant in a study, your identity is kept anonymous. As a member of the Council of American Survey Research Organizations (CASRO), Olson Research Group conforms to CASRO's Code of Standards and Ethics for Survey Research. You can find more information about CASRO at www.casro.org.

Since much of our research is conducted in the healthcare arena, we are particularly aware of the importance of protecting respondent's Personally Identifiable Information, or PII, which is information that can be used on its own or with other information to identify, contact, or locate a single person, or to identify an individual in context. Olson Research fully complies with all legal requirements such as the Health Insurance Portability and Accountability Act of 1996 (HIPPA), and other existing statutes and privacy guidelines. We fully comply with these regulations when handling PII.

Olson Research Group will maintain the security of PII, abiding by industry stated best practices with a commercially reasonable degree of care.

All PII obtained through our research will be treated confidentially, used for research purposes solely by individuals assigned to research and report findings, and will not be disclosed to any person not employed by Olson Research Group, except with consent as required by law or court order.

Olson Research will not transfer PII to a country or territory unless that country or territory ensures the proper protection and handling of sensitive data.

### Your Information

It is important to us that panelists are able to access and correct their information. We want to make sure we can contact you again, and we also want to ensure that our demographic data is up-to-date.

Olson Research encourages you to contact us at any time should you wish to change or modify your information with us or change your consent to contact preference.

You can do any one of the following:

| Send mail to: | Call toll-free: |
|---|---|
| The Olson Research Group, Inc. | 1-888-799-5311 |
| Survey Panel Department | |
| 1020 Stony Hill Road, Suite 300 | Send an email to: |
| Yardley, PA 19067 | Update Contact Info. |

### Removal From Our Database

If at any point you decide that you no longer wish to be a study participant of Olson Research, you can send an email request to info@olsonresearchgroup.com telling us you wish to be removed from our database and you will

no longer be contacted for research studies.

**Privacy Policy Questions**
If you have any questions about this privacy statement, our research process, or suggestions on how we can make our survey experience better for you, please contact us.

Olson Research will periodically review its Privacy Policy and PII collection, use and disclosure practices to ensure we are in compliance with all applicable laws and regulations.

© 2013 Olson Research Group, All Rights Reserved

Pennsylvania Office          California Office
1020 Stony Hill Road, Suite 300   2225 East Bayshore Road, Suite 100
Yardley, PA 19067            Palo Alto, CA 94303
Tel: 267.497.5500           Tel: 866.808.8690

# EXHIBIT D



Olson Research Group, Inc.
Healthcare Marketing Research

ADD MY NAME TO YOUR DATABASE          PRIVACY POLICY          HELP

## Welcome to Olson Online

The Olson Research Group, Inc. is a full-service marketing research firm, specializing in healthcare, consumer and agricultural research. We offer all phases of qualitative and quantitative research solutions.

If you are responding to a current online study, please type the study number below and click Submit:

Study # [          ]  [ SUBMIT ]

© 2013 Olson Research Group, All Rights Reserved.

**Pennsylvania Office**
1020 Stony Hill Road, Suite 300
Yardley, PA 19067
Tel: 267.487.5500

**California Office**
2225 East Bayshore Road, Suite 100
Palo Alto, CA 94303
Tel: 866.898.9890

http://www.olsononlinesystems.com/          1/19/2017

# EXHIBIT E

Contact | Olson Research Group

Case 2:17-cv-05601-GJP   Document 1   Filed 12/14/17   Page 36 of 48

# Olson Research Group, Inc.

| HOME | ABOUT US | QUALITATIVE RESEARCH | QUANTITATIVE RESEARCH | INSIGHTS | CONTACT | REQUEST FOR PROPOSAL |

| HOME | ABOUT US | QUALITATIVE RESEARCH | QUANTITATIVE RESEARCH | INSIGHTS | CONTACT | REQUEST FOR PROPOSAL |

# Contact Us

## PENNSYLVANIA HEADQUARTERS

1020 Stony Hill Road, Suite 200
Yardley, PA 19067
Tel: 267.487.5500
Email: info@olsonresearchgroup.com

## CALIFORNIA OFFICE

225 East Bayshore Road, Suite 100
Palo Alto, CA 94303
Tel: 866.808.6690
Email: info@olsonresearchgroup.com

## FEATURED INSIGHTS

ARE YOU A PHYSICIAN OR OTHER HEALTH CARE PROVIDER?
We invite you to add your name and contact information to our database.

Case 2:17-cv-05601-GJP   Document 1   Filed 12/14/17   Page 37 of 48

# Olson Research Group, Inc.

HOME   ABOUT US   QUALITATIVE RESEARCH   QUANTITATIVE RESEARCH   INSIGHTS   **CONTACT**   REQUEST FOR PROPOSAL

Name:

Company:

Title

Phone:

Email:

Research Interests/Needs

Additional Comments

I'm not a robot

reCAPTCHA
Privacy - Terms

SUBMIT

SUBMIT

CLIENT
SATISFACTION
SURVEY RESULTS

November 9, 2017

View + Download >

BECOME AN INSIGHTS
INSIDER

*Receive Insights
Reports In Your
Inbox*

email

Contact | Olson Research Group

Case 2:17-cv-05601-GJP   Document 1   Filed 12/14/17   Page 38 of 48

http://www.olsonresearchgroup.com/contact/

# Olson Research Group, Inc.

HOME    ABOUT US    QUALITATIVE RESEARCH    QUANTITATIVE RESEARCH    INSIGHTS    **CONTACT**    REQUEST FOR PROPOSAL

## HOW LARGE IS YOUR PANEL OF HEALTHCARE PROVIDERS?

Olson Research Group does not offer a static panel of respondents but instead harnesses a proprietary database that contains ~2.4 million unique healthcare provider records, including 960,000 actively practicing physicians with associated NPI, and ~60,000 nurses and other para-professionals. The foundation of our database, which serves as the backbone for sourcing records as well as ensures the accuracy and validity, is Olson's exclusive partnership with a healthcare database consortium that assists us in cross-checking contact information (i.e. name, phone/email, specialty) with industry sources, and also appends details such as NPI numbers and other relevant targeting information.  Data is imported and updated on a weekly basis.  In conjunction with this relationship, Olson has specialty validation procedures in place for checking the accuracy of respondents during the lifecycle of every project using a multi-step process to ensure we are providing our clients with strategically profiled respondents for highly efficient fielding.

## SPECIALIZE IN?

## WHICH THERAPEUTIC AREAS DO YOU SPECIALIZE IN?

## WHAT ARE YOUR INTERNATIONAL CAPABILITIES?

## HOW DO YOU TYPICALLY CONDUCT YOUR QUALITATIVE AND QUANTITATIVE RESEARCH?

## WHAT KIND OF ACCESS DO YOU HAVE IN THE PAYER

4 of 5

Contact | Olson Research Group

# Olson Research Group, Inc.

HOME    ABOUT US    QUALITATIVE RESEARCH    QUANTITATIVE RESEARCH    INSIGHTS    **CONTACT**    REQUEST FOR PROPOSAL

HOW QUICKLY ARE YOU ABLE TO COMPLETE PROJECTS?

WHAT KIND OF EXPERIENCE DO YOUR PROJECT MANAGERS HAVE?

WHO ARE YOUR CLIENTS?

http://www.olsonresearchgroup.com/contact/

12/12/2017, 4:15 PM

Contact | Olson Research Group

5 of 5

Case 2:17-cv-05601-GJP   Document 1   Filed 12/14/17   Page 40 of 48

http://www.olsonresearchgroup.com/contact/

# Olson Research Group, Inc.

HOME   ABOUT US   QUALITATIVE RESEARCH   QUANTITATIVE RESEARCH   INSIGHTS   **CONTACT**   REQUEST FOR PROPOSAL

insights
A S S O C I A T I O N
C O R P O R A T E   M E M B E R

A 2016
**EXPERT**COMPANY
*in*
Full Service Research
as seen in QUIRK'S

A 2017
**TOP**COMPANY
*for*
B2B Research
as seen in QUIRK'S

A 2017
**TOP**COMPANY
*for*
Pharmaceutical Research
as seen in QUIRK'S

1020 Stony Hill Road,
Suite 200
Yardley, PA 19067
Tel: 267.487.5500

**California Office**
2225 East Bayshore
Road, Suite 100
Palo Alto, CA 94303
Tel: 866.808.6690

© 2017 Olson Research Group. All Rights Reserved.

12/12/2017, 4:15 PM

# EXHIBIT F

# BOCK, HATCH, LEWIS & OPPENHEIM, LLC

134 North La Salle Street, Suite 1000

Chicago, IL 60602

312-658-5500 (Phone) • 312-658-5555 (Fax)

December 12, 2017

In re: *Dr. Richard E. Fischbein v. The Olson Research Group, Inc. and John Does
1-12* (ED Pennsylvania).

**Demand for Preservation of All Tangible Documents
Including Electronically Stored Information**

As part of the Class Action Complaint against The Olson Research
Group, Inc. and John Does 1-12 ("Defendants"), plaintiff, Dr. Richard E.
Fischbein, hereby issues a demand for Defendants to preserve all tangible
documents, including electronically stored information.

As used in this document, "you" and "your" refers to each Defendant,
and its predecessors, successors, parents, subsidiaries, divisions or affiliates,
and its respective officers, directors, agents, attorneys, accountants,
employees, partners or other persons occupying similar positions or performing
similar functions.

You should anticipate that much of the information subject to disclosure
or responsive to discovery in this matter is stored on your current and former
computer systems and other media and devices (including personal digital
assistants, voice-messaging systems, online repositories and cell phones).

Electronically stored information (hereinafter "ESI") should be afforded
the broadest possible definition and includes (by way of example and not as an
exclusive list) potentially relevant information electronically, magnetically or
optically stored as:

• Digital communications (e.g., e-mail, voice mail, instant messaging);
• Word processed documents (e.g., Word or WordPerfect documents and
drafts);
• Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
• Accounting Application Data (e.g., QuickBooks, Money, Peachtree data files);
• Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
• Sound Recordings (e.g., .WAV and .MP3 files);
• Video and Animation (e.g., .AVI and .MOV files);
• Databases (e.g., Access, Oracle, SQL Server data, SAP);

1

- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, Yahoo, blog tools);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and,
- Back Up and Archival Files (e.g., Zip, .GHO)

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obliged to preserve potentially relevant evidence from both these sources of ESI, even if you do not anticipate producing such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to amendments to the Federal Rules of Civil Procedure that have been approved by the United States Supreme Court (eff. 12/1/05), you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may then order production of the ESI, even if it finds that it is not reasonably accessible. Accordingly, even ESI that you deem reasonably inaccessible must be preserved in the interim so as not to deprive the plaintiffs of their right to secure the evidence or the Court of its right to adjudicate the issue.

## A. Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI regarding the time period of December 2013 to the date You receive this letter. Potentially relevant ESI includes, but is not limited to information:

1. Regarding the events and causes of action described in Plaintiff's Class Action Complaint; and
2. Regarding Your claims or defenses to Plaintiff's Class Action Complaint.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of ESI. Be advised that sources of ESI are altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI. Nothing in this demand for preservation of ESI should be understood to diminish your

2

concurrent obligation to preserve document, tangible things and other
potentially relevant evidence.

### B.    Suspension of Routine Destruction

You are directed to immediately initiate a litigation hold for potentially
relevant ESI, documents and tangible things, and to act diligently and in good
faith to secure and audit compliance with such litigation hold. You are further
directed to immediately identify and modify or suspend features of your
information systems and devices that, in routine operation, operate to cause
the loss of potentially relevant ESI. Examples of such features and operations
include:

• Purging the contents of e-mail repositories by age, capacity or other criteria;
• Using data or media wiping, disposal, erasure or encryption utilities or
devices;
• Overwriting, erasing, destroying or discarding back up media;
• Re-assigning, re-imaging or disposing of systems, servers, devices or media;
• Running antivirus or other programs effecting wholesale metadata alteration;
• Releasing or purging online storage repositories;
• Using metadata stripper utilities;
• Disabling server or IM logging; and,
• Executing drive or file defragmentation or compression programs.

### C.    Guard Against Deletion

You should anticipate that your employees, officers or others may seek to
hide, destroy or alter ESI and act to prevent or guard against such actions.
Especially where company machines have been used for Internet access or
personal communications, you should anticipate that users may seek to delete
or destroy information they regard as personal, confidential or embarrassing
and, in so doing, may also delete or destroy potentially relevant ESI. This
concern is not one unique to you or your employees and officers. It's simply an
event that occurs with such regularity in electronic discovery efforts that any
custodian of ESI and their counsel are obliged to anticipate and guard against
its occurrence.

### D.    Preservation by Imaging

You should take affirmative steps to prevent anyone with access to your
data, systems and archives from seeking to modify, destroy or hide electronic
evidence on network or local hard drives (such as by deleting or overwriting
files, using data shredding and overwriting applications, defragmentation, re-
imaging or replacing drives, encryption, compression, steganography or the
like). With respect to local hard drives, one way to protect existing data on local
hard drives is by the creation and authentication of a forensically qualified

3

image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bitstream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

With respect to the hard drives and storage devices of each of the persons named below and of each person acting in the capacity or holding the job title named below, as well as each other person likely to have information pertaining to the instant action on their computer hard drive(s), demand is made that you immediately obtain, authenticate and preserve forensically qualified images of the hard drives in any computer system (including portable and home computers) used by that person during the period from December 2013 to today's date as well as recording and preserving the system time and date of each such computer.

Once obtained, each such forensically qualified image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

### E.   Preservation in Native Form

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means or make it difficult or burdensome to access or use the information efficiently in the litigation. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

### F.   Metadata

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. Be advised that metadata may be overwritten or corrupted by careless

4

handling or improper steps to preserve ESI. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

### G.   Servers

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server depending upon, e.g., its RAID configuration and whether it can be downed or must be online 24/7. If you question whether the preservation method you pursue is one that we will accept as sufficient, please call to discuss it.

### H.   Home Systems, Laptops, Online Accounts and Other ESI Venues

Though we expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems may contain potentially relevant data. To the extent that officers, board members or employees have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drives, CD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.). Similarly, if employees, officers or board members used online or browser-based email accounts or services (such as AOL, Gmail, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

### I.   Ancillary Preservation

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters or the like.

You must preserve any passwords, keys or other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI. You must preserve any cabling, drivers and hardware, other than a standard 3.5" floppy disk drive or standard CD or DVD optical disk drive, if needed to access

5

or interpret media on which ESI is stored. This includes tape drives, bar code readers, Zip drives and other legacy or proprietary devices.

### J.    Paper Preservation of ESI is Inadequate

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

### K.    Agents, Attorneys and Third Parties

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI, including but not limited to persons/entities involved in marketing, advertising, and fax broadcasting on your behalf, to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

### L.    System Sequestration or Forensically Sound Imaging

We suggest that, with respect to Defendants removing their ESI systems, media and devices from service and properly sequestering and protecting them may be an appropriate and cost-effective preservation step. In the event you deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

By "forensically sound," we mean duplication, for purposes of preservation, of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including the so-called "unallocated clusters," holding deleted files.

6

### M.   Preservation Protocols

We are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol, if you will furnish an inventory of the systems and media to be preserved. Else, if you will promptly disclose the preservation protocol you intend to employ, perhaps we can identify any points of disagreement and resolve them. A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective expert(s) can work cooperatively to secure a balance between evidence preservation and burden that's fair to both sides and acceptable to the Court.

### N.   Do Not Delay Preservation

I'm available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

### O.   Confirmation of Compliance

Please confirm that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

Respectfully,

Phillip A. Bock
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. LaSalle St., Suite 1000
Chicago, IL 60602
512-739-0390 (cell)
312-658-5515 (direct)
service@classlawyers.com

7

JS 44 (Rev. 07/16)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
Dr. Richard E. Fischbein

**DEFENDANTS**
The Olson Research Group, Inc.

**(b)** County of Residence of First Listed Plaintiff    Luzerne Couty, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. La Salle St., Ste. 1000
Chicago, IL 60602 Telephone: 312-658-5500

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ❏ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal | ❏ 376 Qui Tam (31 USC |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ❏ 140 Negotiable Instrument | Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 368 Asbestos Personal | | ❏ 840 Trademark | ❏ 460 Deportation |
| Student Loans | ❏ 340 Marine | Injury Product | | | ❏ 470 Racketeer Influenced and |
| (Excludes Veterans) | ❏ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ❏ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 480 Consumer Credit |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ |
| ❏ 190 Other Contract | Product Liability | ❏ 380 Other Personal | Relations | ❏ 864 SSID Title XVI | Exchange |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ☒ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | ❏ 385 Property Damage | ❏ 751 Family and Medical | | ❏ 891 Agricultural Acts |
| | ❏ 362 Personal Injury - | Product Liability | Leave Act | | ❏ 893 Environmental Matters |
| | Medical Malpractice | | ❏ 790 Other Labor Litigation | | ❏ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ❏ 870 Taxes (U.S. Plaintiff | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | or Defendant) | ❏ 899 Administrative Procedure |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | Act/Review or Appeal of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other | ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from Another District *(specify)*
- ❏ 6  Multidistrict Litigation - Transfer
- ❏ 8  Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
47 U.S.C. § 227
Brief description of cause:
Violation of the Telephone Consumer Protection Act

### VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ❏ Yes    ❏ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
12/14/2017

SIGNATURE OF ATTORNEY OF RECORD
Phillip A. Bock

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
   United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.   **Origin.** Place an "X" in one of the seven boxes.
   Original Proceedings. (1) Cases which originate in the United States district courts.
   Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
   Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
   Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
   Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Case 2:17-cv-05601 UNITED STATES DISTRICT COURT /17   Page 1 of 1

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:  Dr. Richard E. Fischbein, 562 Wyoming Ave. FL 1 Kingston, PA 18704

Address of Defendant:  The Olson Research Group, Inc., 1020 Stony Hill Road, Suite 300 Yardley, PA 10967

Place of Accident, Incident or Transaction: _____
                                              (Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
    (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))                Yes□   No☒

Does this case involve multidistrict litigation possibilities?                                                Yes□   No☒
RELATED CASE, IF ANY:
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                                                            Yes□   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                                                                            Yes□   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                                                                                                            Yes□   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                                                            Yes□   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. Federal Question Cases:

1. □ Indemnity Contract, Marine Contract, and All Other Contracts
2. □ FELA
3. □ Jones Act-Personal Injury
4. □ Antitrust
5. □ Patent
6. □ Labor-Management Relations
7. □ Civil Rights
8. □ Habeas Corpus
9. □ Securities Act(s) Cases
10. □ Social Security Review Cases
11. ☑ All other Federal Question Cases
    (Please specify)  47 U.S.C. § 227
    □

B. Diversity Jurisdiction Cases:

1. □ Insurance Contract and Other Contracts
2. □ Airplane Personal Injury
3. □ Assault, Defamation
4. □ Marine Personal Injury
5. □ Motor Vehicle Personal Injury
6. □ Other Personal Injury (Please specify)
7. □ Products Liability
8. □ Products Liability — Asbestos
9. □ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**
(Check Appropriate Category)

I, Richard Shenkan _____, counsel of record do hereby certify:
    ☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
    ☒ Relief other than monetary damages is sought.

DATE:  12/14/2017          Richard Shenkan                    _____
                           Attorney-at-Law                    Attorney I.D.#
    NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:  12/14/2017          Richard Shenkan                    _____
                           Attorney-at-Law                    Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

DR. RICHARD E. FISCHBEIN,
individually and as the representatives of a class
of similarly-situated persons,                  :                    CIVIL ACTION
                            v.                   :
THE OLSON RESEARCH GROUP,                        :                    NO.   17      5601
INC.,                                            :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                           ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.  ( X )

| 12/14/2017 | Richard Shenkan | Dr. Richard E. Fischbein |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 248-562-1320 | 888-769-1774 | rshenkan@shenkanlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

DEC 14 2017

# EXHIBIT 4

STANDARD,SUSPENSE

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:17-cv-05601-GJP

| | |
|---|---|
| FISCHBEIN v. THE OLSON RESEARCH GROUP, INC. et al | Date Filed: 12/14/2017 |
| | Date Terminated: 07/02/2018 |
| Assigned to: HONORABLE GERALD J. PAPPERT | Jury Demand: None |
| Cause: 47:227(b)(3) Telephone Consumer Protection Act of 1991 | Nature of Suit: 890 Other Statutes: Other Statutory Actions |
| | Jurisdiction: Federal Question |

**Plaintiff**

**DR. RICHARD E. FISCHBEIN**          represented by **PHILLIP A. BOCK**
BOCK HATCH LEWIS &
OPPENHEIM LLC
134 NORTH LA SALLE ST STE 1000
CHICAGO, IL 60602
312-658-5500
Email: phil@bockhatchllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RICHARD E. SHENKAN**
SHENKAN INJURY LAWYERS LLC
6550 Lakeshore Street
West Bloomfield, MI 48323
412-716-5800
Email: rshenkan@shenkanlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**THE OLSON RESEARCH GROUP, INC.**          represented by **SAMANTHA L. SOUTHALL**
BUCHANAN INGERSOLL &
ROONEY PC
50 S. 16TH ST STE 3200
TWO LIBERTY PLACE
PHILADELPHIA, PA 19102
215-665-3884
Email: samantha.southall@bipc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

United States District Court Eastern District of Pennsylvania                     Page 2 of 4

**JOHN DOES 1-12**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/14/2017 | 1 | COMPLAINT against JOHN DOES 1-12, THE OLSON RESEARCH GROUP, INC. ( Filing fee $ 400 receipt number 170517.), filed by RICHARD E. FISCHBEIN.(rt) (Additional attachment(s) added on 12/15/2017: # 1 Civil Cover Sheet, # 2 Designation Form, # 3 Case Management Track Form) (rt, ). (Entered: 12/15/2017) |
| 12/14/2017 | | Summons Issued as to THE OLSON RESEARCH GROUP, INC. One Given To: Counsel on December 15, 2017 (rt) (Entered: 12/15/2017) |
| 12/14/2017 | 2 | MOTION FOR CLASS CERTIFICATION OR IN THE ALTERNATIVE, A STAY OF CLASS CERTIFICATION BRIEFING PENDING DISCOVERY filed by RICHARD E. FISCHBEIN.. (Attachments: # 1 Memorandum)(rt) (Entered: 12/15/2017) |
| 01/12/2018 | 3 | STIPULATION AND ORDER THAT TIME TO RESPOND TO THE COMPLAINT IS EXTENDED TO 2/22/18. SIGNED BY HONORABLE GERALD J. PAPPERT ON 1/12/18. 1/12/18 ENTERED AND COPIES EMAILED.(rf, ) (Entered: 01/12/2018) |
| 01/12/2018 | 4 | AFFIDAVIT of Service by Scott Segal re: served Summons, Complaint, Civil Cover Sheet, Designation Form upon Anthony Lewis by Corporate Service on 1/2/2018 (SHENKAN, RICHARD) (Entered: 01/12/2018) |
| 02/15/2018 | 5 | STIPULATION AND ORDER THAT TIME FOR DEFENDANT OLSON RESEARCH GROUP TO ANSWER, MOVE OR RESPOND TO COMPLAINT IS EXTENDED TO 3/26/18. SIGNED BY HONORABLE GERALD J. PAPPERT ON 2/15/18. 2/15/18 ENTERED AND COPIES EMAILED.(rf, ) (Entered: 02/15/2018) |
| 03/22/2018 | 6 | STIPULATION AND ORDER THAT THE OLSON RESEARCH GROUP, INC. TO ANSWER, MOVE OR OTHERWISE RESPOND TO THE COMPLAINT IS EXTENDED FOR A PERIOD OF THIRTY (30) DAYS UP TO AND INCLUDING 4/13/2018. SIGNED BY HONORABLE GERALD J. PAPPERT ON 3/22/18. 3/22/18 ENTERED AND COPIES E-MAILED.(ti, ) (Main Document 6 replaced on 3/22/2018) (ti, ). Modified on 3/22/2018 (ti, ). (Entered: 03/22/2018) |
| 04/13/2018 | 7 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by THE OLSON RESEARCH GROUP, INC..Memorandum. (Attachments: # 1 Text of Proposed Order, # 2 Memorandum)(SOUTHALL, SAMANTHA) (Entered: 04/13/2018) |
| 04/26/2018 | 8 | STIPULATION re 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *STIPULATION PURSUANT TO LOC. R. 7.4 (b) (2) FOR EXTENSION OF TIME TO RESPOND TO DEFENDANT'S MOTION TO DISMISS* by RICHARD E. FISCHBEIN. (SHENKAN, RICHARD) (FILED IN ERROR BY ATTY) Modified on 4/27/2018 (md). (Entered: 04/26/2018) |
| | | |

United States District Court Eastern District of Pennsylvania                                    Page 3 of 4

| 04/26/2018 | 9 | STIPULATION AND ORDER THAT PLAINTIFF HAS UNTIL 5/10/18 TO RESPOND TO DEFENDANTS MOTION TO DISMISS. SIGNED BY HONORABLE GERALD J. PAPPERT ON 4/26/18. 4/26/18 ENTERED AND COPIES EMAILED.(rf, ) (Entered: 04/26/2018) |
| 05/10/2018 | 10 | RESPONSE in Opposition re 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by RICHARD E. FISCHBEIN. (Attachments: # 1 Text of Proposed Order Proposed Order Denying Defendant's Motion for Summary Judgment)(SHENKAN, RICHARD) (Entered: 05/10/2018) |
| 05/17/2018 | 11 | RESPONSE in Support re 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by THE OLSON RESEARCH GROUP, INC.. (SOUTHALL, SAMANTHA) (Entered: 05/17/2018) |
| 06/01/2018 | 12 | NOTICE: ORAL ARGUMENT ON THE MOTION TO DISMISS 7 HAS BEEN SCHEDULED FOR WEDNESDAY JUNE 13, 2018 AT 11:00 AM IN COURTROOM 10-A BEFORE THE HONORABLE GERALD J. PAPPERT. (kf, ) (Entered: 06/01/2018) |
| 06/11/2018 | 13 | APPLICATION for Pro Hac Vice Admission of Phillip A. Bock filed by RICHARD E. FISCHBEIN, Statement, Certificate of Service.(SHENKAN, RICHARD) Modified on 6/13/2018 (md). (Entered: 06/11/2018) |
| 06/11/2018 | 14 | APPLICATION for Pro Hac Vice Admission of Tod A. Lewis filed by RICHARD E. FISCHBEIN, Statement, Certificate of Service.(SHENKAN, RICHARD) Modified on 6/13/2018 (md). (Entered: 06/11/2018) |
| 06/12/2018 | 15 | ORDER THAT PLAINTIFFS MOTIONS FOR PRO HAC VICE ADMISSION (DOC. 13 & 14) ARE DENIED. SIGNED BY HONORABLE GERALD J. PAPPERT ON 6/12/18. 6/12/18 ENTERED AND COPIES EMAILED.(rf, ) (Entered: 06/12/2018) |
| 06/12/2018 | 16 | NOTICE: ORAL ARGUMENT ON THE MOTION TO DISMISS (ECF NO. 7) FILED BY THE OLSON RESEARCH GROUP, INC. PREVIOUSLY SCHEDULED FOR JUNE 13, 2018 HAS BEEN RESCHEDULED TO MONDAY, JULY 2, 2018 AT 11:00 AM., BEFORE THE HONORABLE GERALD J. PAPPERT, IN COURTROOM 10-A, ON THE TENTH FLOOR, AT THE UNITED STATES COURTHOUSE, 601 MARKET STREET, PHILADELPHIA, PA 19106. (kf, ) (Entered: 06/12/2018) |
| 06/12/2018 | | Set/Reset Deadlines as to 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . MOTION HEARING SET FOR 7/2/2018 11:00 AM BEFORE HONORABLE GERALD J. PAPPERT. (md) (Entered: 06/14/2018) |
| 06/21/2018 | 17 | MOTION for Pro Hac Vice of Phillip A. Bock ( Filing fee $ 40 receipt number 0313-12881706.) filed by RICHARD E. FISCHBEIN.Declaration, Certificate of Service. (Attachments: # 1 Exhibit Declaration of Phillip A. Bock, # 2 Phillip A. Bock Jurisdictions, # 3 Text of Proposed Order Proposed Order Granting Motion for PHV)(SHENKAN, RICHARD) (Entered: 06/21/2018) |
| 06/22/2018 | 18 | ORDER THAT PHILLIP A. BOCK IS ADMITTED PRO HAC VICE TO PRACTICE IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF PENNSYLVANIA; ETC.. SIGNED BY HONORABLE |

Case 8:18-cv-01997-DOC-KES   Document 17-1   Filed 02/07/19   Page 103 of 167   Page ID
#:150
United States District Court Eastern District of Pennsylvania                    Page 4 of 4

| | | GERALD J. PAPPERT ON 6/21/18.6/22/18 ENTERED AND COPIES MAILED, E-MAILED.(jl, ) (Entered: 06/22/2018) |
|---|---|---|
| 07/02/2018 | 19 | ORDER THAT THE CLERK OF COURT SHALL PLACE THIS MATTER ON THE CIVIL SUSPENSE DOCKET PENDING A DECISION BY THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT IN ROBERT W. MAUTHE, M.D., P.C. V. NATL IMAGING ASSOCS., INC., NO. 17-1916, 2018 WL 1960945 (E.D. PA. APR. 25, 2018), APPEAL PENDING, NO. 18-2119 (3D CIR. 2018). IT IS FURTHERED ORDERED THAT BOTH PARTIES SHALL PROVIDE THE COURT WITH A LETTER BRIEF NOT TO EXCEED 5 PAGES IN LENGTH WITHIN 14 DAYS OF THE THIRD CIRCUITS DECISION IN THAT CASE. THE BRIEF SHALL INFORM THE COURT HOW THE THIRD CIRCUITS DECISION AFFECTS THE PENDING MOTION TO DISMISS (ECF NO. 7 ). SIGNED BY HONORABLE GERALD J. PAPPERT ON 7/2/18. 7/2/18 ENTERED AND COPIES E-MAILED. (va, ) (Entered: 07/02/2018) |
| 07/05/2018 | 20 | Minute Entry for proceedings held before HONORABLE GERALD J. PAPPERTin Courtroom 10-A Motion Hearing held on 7/2/2018 re 7 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by THE OLSON RESEARCH GROUP, INC. Court Reporter: ESR. (amas) (Entered: 07/05/2018) |
| 08/03/2018 | 21 | TRANSCRIPT of Motion Hearing Proceedings held on 7/2/18 before Judge PAPPERT. Court Reporter: WRITERS CRAMP, INC.. (rf, ) (Entered: 08/03/2018) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 02/06/2019 15:54:55 | | | |
| PACER Login: | argiadimarco:3886370:3938582 | Client Code: | 0066005-000070-NK |
| Description: | Docket Report | Search Criteria: | 2:17-cv-05601-GJP |
| Billable Pages: | 3 | Cost: | 0.30 |

# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | . | |
| Richard E. Fischbein, | . | Docket #CV-17-5601 (GJP) |
| | . | |
| Plaintiff, | . | |
| | . | United States Courthouse |
| vs. | . | Philadelphia, PA |
| | . | July 2, 2018 |
| The Olson Research | . | 11:06 a.m. |
| Group, Inc., et al., | . | |
| | . | |
| Defendants. | . | |

......................................................

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE GERALD J. PAPPERT
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For The Plaintiff:              Phillip A. Bock, Esq.
                               Bock Hatch Lewis
                               & Oppenheim, LLC
                               134 N. LaSalle St.-Ste. 1000
                               Chicago, IL 60602

For The Defendants:            Samantha L. Southall, Esq.
                               Buchanan Ingersoll & Rooney, PC
                               50 S. 16th St.-Ste. 3200
                               Two Liberty Place
                               Philadelphia, PA 19102

Audio Operator                 Jeff Lucini

Transcribing Firm:             Writer's Cramp, Inc.
                               63 Dakota Drive
                               Hamilton, NJ 08619
                               609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

```
1              THE COURT:  Ms. Southall, how are you?
2              MS. SOUTHALL:  I'm doing well, Your Honor, how are
3    you?
4              THE COURT:  Good, thank you.  And Mr. Bock, how are
5    you doing?
6              MR. BOCK:  Good morning, Your Honor, thank you for
7    having me.
8              THE COURT:  Well, thank you.  So if I ever have the
9    pleasure of presiding over a trial in this case, who is lead
10   trial counsel, you or Mr. Shanken?
11             MR. BOCK:  It would be me or another attorney from
12   my firm.
13             THE COURT:  What's Mr. Shanken's role in this?
14             MR. BOCK:  He is the -- he's our co-counsel, he's
15   the client contact, too.  So he's a plaintiff's -- he's a
16   personal injury lawyer, but he also does class actions, and my
17   firm only does class actions.
18             THE COURT:  Okay, so you're lead trial -- you or
19   someone from Bock Hatch Lewis & Oppenheim would be lead trial
20   counsel?
21             MR. BOCK:  Yes.
22             THE COURT:  Would Mr. Shanken have a role at a
23   trial?  Would he second chair or is he just --
24             MR. BOCK:  I think he would.  He's a trial lawyer,
25   he's not a class action trial lawyer, and there's some
```

3

1  differences there, but --

2         THE COURT:  Okay.  Okay.  So I guess one question

3  that I've had, and one of the things I wanted to ask you to

4  make your visit here as productive as possible, and I guess

5  I'll start with you, Mr. Bock, because unlike Ms. Southall,

6  you are involved in the -- am I pronouncing it right --

7  Mauthe, Mauthe --

8         MR. BOCK:  Mauthe, yeah.

9         THE COURT:  Mauthe case?  You can sit down, thanks.

10  So I have read, and Ms. Southall, I know you've seen that

11  opinion as well from Chief Judge Stengel.

12         MS. SOUTHALL:  Yes.

13         THE COURT:  And I have read Chief Judge Stengel's

14  opinion and know also that it has been appealed.  And we had -

15  - let's see, I know I had the appellate docket here.  The

16  latest action in the case has been something that's not

17  available for my review on the docket, but -- well, at least I

18  guess I could dig into it, but I didn't.  There has not been a

19  panel yet assigned.  There has not been a briefing schedule

20  yet assigned, correct?

21         MR. BOCK:  Correct, yes.

22         THE COURT:  Okay.  So as a practical matter, there

23  are a couple of issues, in fact, that neither of you touched

24  on, I don't recall anyway, and if so, in not much detail in

25  your briefs.  And they are issues that I'm going to assume the

4

1    Third Circuit is going to take up as part of it's decision in
2    this case, and those are the Hobbs Act and Chevron deference,
3    among other things; whether this constituted an ad, whether
4    this court has to apply the FCC rule, whether the Hobbs Act
5    divests me of jurisdiction, Chevron deference, all that great
6    stuff.  So the practical question is why should I decide this
7    case now?  How does it benefit either of the parties for me to
8    decide this case now?  And we can get into this last question
9    in a little bit greater detail, but if Judge Stengel is
10   affirmed -- and you can think about this, Mr. Bock, as we go
11   through this exercise today -- but if Judge Stengel were to be
12   affirmed, how would you get past a motion to dismiss in this
13   case, or whether the Third Circuit's ruling in that case would
14   likely make this an easy one for me to just, you know, grant?
15   So that's one argument.  I know you've got some distinctions
16   you'll probably want to argue, but as a practical matter, I
17   throw out both to counsel.  One option that we have here, and
18   very candidly, it's the most attractive option to me for a
19   whole host of reasons, is to put the case in civil suspense
20   pending a ruling from the circuit in the Mauthe case.  I am
21   not a big civil suspense guy.  I don't like putting cases in
22   civil suspense.  The lawyers forget about them.  The judge
23   even forgets about them from time to time.  And I really don't
24   like doing that.  It's just my personal view; my colleagues, I
25   have colleagues who disagree and use civil suspense on a

5

1    grander scale.  But this is one case where it seems like a

2    real no-win for the court.  Because I could write my typically

3    absolutely freaking brilliant opinion on this case, and the

4    circuit, if the affirm Judge Stengel, may end up being a me-

5    too for me, and if they reverse Judge Stengel and send it

6    back, that, too, doesn't seem to be to my advantage if I were

7    to grant the motion.  So I throw that out.  Preliminary

8    thoughts from anybody on any of that stuff, big-picture stuff?

9    I hate to hit you with practical big-picture stuff, but these

10   are the things I think about.

11           MR. BOCK:  As you said, I was prepared to talk about

12   differences between this case and that case.

13           THE COURT:  Right.

14           MR. BOCK:  If we win that appeal or lose that

15   appeal, I think is still a different case.  It depends on what

16   the Third Circuit says --

17           THE COURT:  Yes, and how they say it and what issue

18   -- I mean, look, I'm assuming -- and I shouldn't do this --

19   the circuits that have taken this up -- actually, <u>Sandusky</u>

20   didn't, but the Fourth Circuit did, really got into the whole

21   Hobbs Act and Chevron deference.  And there are judges

22   upstairs on both sides of the aisle who have very strong views

23   on Chevron deference and The Administrative Procedures Act and

24   all that.  And, you know, it very well could -- this could be

25   an issue that creates a precedential opinion in our circuit if

6

1    they wade into that.  And candidly, I don't know why they

2    wouldn't, but maybe they'll find a way to distinguish Judge

3    Stengel's case from the need to do that.  What do you think,

4    Ms. Sounthall?

5              MS. SOUTHALL:  I do think that makes some sense,

6    Your Honor.  I would be interested to see how the Third

7    Circuit comes out on that --

8              THE COURT:  Right.

9              MS. SOUTHALL:  -- as opposed to the Fourth Circuit.

10   And also, I'm aware of a petition currently pending before the

11   FCC involving M3.  That case was stayed down in the Southern

12   District of Florida --

13             THE COURT:  Oh, okay.

14             MS. SOUTHALL:  -- pending a petition.  I do --

15             THE COURT:  Could you send that -- where would be

16   find that?

17             MS. SOUTHALL:  Let me give you the cites.

18             THE COURT:  Yes.

19             MS. SOUTHALL:  I found it --

20             THE COURT:  Connor, we didn't see that one yet, did

21   we?

22             THE CLERK:  (Indiscern.).

23             THE COURT:  The M3 case, but not the petition and --

24   okay.

25             MS. SOUTHALL:  Here, let me --

7

```
 1              THE COURT:  Yes.
 2              MS. SOUTHALL:  I've got the cite for you right here.
 3              THE COURT:  Okay.
 4              MS. SOUTHALL:  I found it while preparing, and it
 5    said maybe --
 6              THE COURT:  Was it in your brief, did I overlook it?
 7              MS. SOUTHALL:  It was not --
 8              THE COURT:  Oh, okay.
 9              MS. SOUTHALL:  -- I found it while preparing today -
10    -
11              THE COURT:  Okay.
12              MS. SOUTHALL:  -- for today.
13              THE COURT:  Okay.
14              MS. SOUTHALL:  Give me one second --
15              THE COURT:  Sure.
16              MS. SOUTHALL:  -- I just had it.  Which means I
17    can't find it.
18              THE COURT:  That's okay, I mean, even if you can --
19              MS. SOUTHALL:  I got it, I just --
20              MR. BOCK:  The case is cited in our brief.
21              MS. SOUTHALL:  Yeah --
22              THE COURT:  Yes, the case itself, I've seen.
23              MS. SOUTHALL:  The petition is at -- it's a Lexus
24    cite.  Here, wait, why don't I do this.  May I approach?
25              THE COURT:  Sure, absolutely.
```

                                                                8

 1              MS. SOUTHALL:  I can just give you my copy.

 2              THE COURT:  Yes, absolutely.  Yes -- oh, thanks,

 3      Connor.

 4              MS. SOUTHALL:  So here's the description of the

 5      petition and then the four issues that are before the FCC.

 6      And, I mean, I think Mr. Bock is involved with that case as

 7      well.

 8              THE COURT:  Right.

 9              MS. SOUTHALL:  My understanding is that all the

10      comments have been submitted for some period of time, probably

11      within the last year, and we're just waiting to hear back from

12      Mr. Pai's commission.

13              THE COURT:  Okay.  Okay.

14         (Pause in proceedings)

15              MS. SOUTHALL:  And in that instance, the court

16      stayed the case pending what --

17              THE COURT:  How many other --

18              MS. SOUTHALL:  -- the FCC did.

19              THE COURT:  -- circuits have taken it up?  I know

20      Six, Four, Ninth --

21              MS. SOUTHALL:  Ninth.

22              MR. BOCK:  Have taken up whether something is an

23      advertisement?

24              THE COURT:  Correct, and/or the Chevron deference

25      issue.

                                                                    9

1               MR. BOCK:  Eight took up Chevron in <u>Walberg</u>.

2               THE COURT:  Right.

3               MR. BOCK:  There's an Eighth Circuit opinion about

4      is it an advertisement, it's a per curium.  There's an

5      Eleventh Circuit.

6               THE COURT:  Okay.

7               MR. BOCK:  Nothing in the Third, Seventh, First,

8      Second.

9               THE COURT:  Okay.  Well, I'll tell you what, I want

10     to make this -- I thought about, perhaps too late -- and

11     that's on me -- I thought about getting you on the phone and

12     saying is there any need for you to come in?  Should we just

13     stay this?  I didn't think about that in time.  I did my prep

14     over the weekend.  And now let's just make your attendance

15     here as productive as we can.  We'll have any argument on all

16     the issues, we'll -- Mr. Lucini, we'll order a copy of the

17     transcript, doesn't have to be expedited, and we'll put that

18     in our file.  And then I really do think it might be best for

19     everybody if we sit -- and I wish -- I don't like civil

20     suspense, and I particularly am not thrilled with the fact

21     that it's just recently gone up.  If it's an NPO, a non-

22     precedential opinion, we could probably get a decision by the

23     fall.  If it is going to be scheduled for oral argument, and

24     likely a precedential opinion, that could take us into later

25     in the year, maybe even early next year.  That's not optimal,

10

1    but I just don't know how much sense it makes for me to try to

2    weigh in on this when I know that guys upstairs are going to

3    weigh in on it.  But I really do want to hear you out on both

4    sides of this case.  We've read the briefs.  And I've read

5    Sandusky, I've read Chief Judge Stengel's opinion as well.

6    I've read the Fourth Circuit opinion.  And then Mr. Maloney

7    here has read some more and we've discussed them.  So I'll

8    tell you what, Ms. Southall, it's your motion.  If you don't

9    mind coming up --

10             MS. SOUTHALL:  Sure.

11             THE COURT:  -- and we can have it out and then

12   decide how we --

13             MS. SOUTHALL:  Take it from there?

14             THE COURT:  What makes the most sense, yes.

15             MS. SOUTHALL:  Okay.  Good morning, Your Honor.

16             THE COURT:  Good morning.

17             MS. SOUTHALL:  My name is Samantha Southall, and I

18   am here today on behalf of defendant Olson Research Group.  In

19   April of this year, Olson Research filed a motion to dismiss

20   plaintiff's class action for failure to state a claim.  And as

21   Your Honor is aware, the complaint contains two counts:  One

22   for violation of the TCPA and a second for conversion.  More

23   specifically, the complaint alleges that on May 17th of last

24   year, plaintiff received an unsolicited fax which is attached

25   to the complaint as Exhibit A.  Dr. Fischbein seeks to

1    represent a class of people who received an unsolicited fax

2    for the four years before plaintiff filed his complaint --

3              THE COURT:  And is it -- are we -- is it the one

4    fax?

5              MS. SOUTHALL:  The one fax.

6              THE COURT:  Okay.  And I won't get into the class

7    issues now, but we're talking about that May 27 -- May 17,

8    2017 fax.

9              MS. SOUTHALL:  Correct, one fax.

10             THE COURT:  Okay.

11             MS. SOUTHALL:  And that fax invited Dr. Fischbein to

12   participate in a market research study and directed him to a

13   website, which is www.olsononlinesystems.com.  So the basis of

14   our motion is two-fold.  First, the one fax at issue is not an

15   advertisement under the TCPA, and second, plaintiff hasn't

16   sufficiently stated a claim for common law conversion under

17   Pennsylvania law.

18        So for context, a good place to start might be to talk

19   about what Olson Research does and how it's business model is

20   different than the typical TCPA defendant.  Simply put, it's

21   not consumer facing.  It doesn't sell goods or services that

22   are used by consumers.  It is a market research firm which is

23   retained by pharmaceutical companies, healthcare companies,

24   agribusiness and animal health companies, among others.  One

25   portion of its market research is market research involving

12

1   physicians, and one portion of the physician research is done

2   through sending faxes out to physicians' offices and inviting

3   them to participate in a study.  As compensation for

4   participating in the study, the physician receives an

5   honorarium of $150.

6           THE COURT: How long has that been going on?  Was

7   that honorarium developed as a result of some of the

8   litigation around this statute, or has that been the business

9   model for quite some time?

10          MS. SOUTHALL:  That's been the business model for

11  quite some time.  And it's one component.  They reach people

12  in other ways as well.

13          THE COURT:  Now, the plaintiff here, of course, now

14  says that that payment elevates this to a commercial

15  transaction.  Are you aware of any other cases where there has

16  been a payment --

17          MS. SOUTHALL:  Yes.

18          THE COURT:  -- like this?

19          MS. SOUTHALL:  Yes.  There are two that we found --

20          THE COURT:  Right.

21          MS. SOUTHALL:  -- Phillips Randolph Enterprises out

22  of the Northern District of Illinois, which is cited in our

23  brief.

24          THE COURT:  Right.

25          MS. SOUTHALL:  And Davis Neurology out of the

13

1   Eastern District of Arkansas from last year, which is also

2   cited in our brief.

3           THE COURT:  Right, okay.

4           MS. SOUTHALL:  Those are the two cases, and in both

5   situations the court found that it's not an advertisement.

6   They were both market research studies where the participant

7   received money.  And in both instances, I can confirm --

8           THE COURT:  Was the fact that the participant

9   received money a material part of the court's decision?

10          MS. SOUTHALL:  No.

11          THE COURT:  No.  It's just that this is almost the

12  next level to making sure that the goods -- I mean, even the

13  goods and services, according to the FCC, that are offered for

14  free --

15          MS. SOUTHALL:  Right.

16          THE COURT:  -- can be an add.

17          MS. SOUTHALL:  Correct.

18          THE COURT:  This is even the next level, right?

19          MS. SOUTHALL:  Correct.

20          THE COURT:  Okay.

21          MS. SOUTHALL:  Correct.

22          THE COURT:  Okay.

23          MS. SOUTHALL:  And this is very attenuated and very

24  far afield from what the TCPA was intended to be.  I mean,

25  when it was enacted in 1991, it was enacted, as Senator

14

1   Holland said, to prevent the scourge of telemarketing calls at

2   a time when we all had a phone on our wall and it would ring

3   incessantly during the dinner hour.  That's not what this case

4   is.  We -- Olson does not sell anything that plaintiff can

5   use, that plaintiff's patients can use.  It is not offering a

6   free seminar, a free directory, it's merely asking plaintiff

7   to participate in a market research study.

8         THE COURT:  And the market research that Olson then

9   gathers is disseminated how to its clients?

10        MS. SOUTHALL: It is aggregated, put into a report

11  and shared with the client.

12        THE COURT:  Okay, and then --

13        MS. SOUTHALL:  There is no personally identifiable

14  information that is transmitted to the client.

15        THE COURT:  And the clients obviously pay Olson for

16  this data, this information?

17        MS. SOUTHALL:  Correct.

18        THE COURT:  Okay.  Okay, and then they use -- the

19  clients use that as they see fit to govern their business

20  strategy, et cetera.

21        MS. SOUTHALL:  Correct.

22        THE COURT:  Okay.

23        MS. SOUTHALL:  Correct.  I mean, so this is not like

24  the cases that plaintiff cites, for the most part, where the

25  defendant is selling something that the fax participant can

15

1    use.

2              THE COURT:  Or --

3              MS. SOUTHALL:  Or can recommend to his patients.

4              THE COURT:  Or referring them to a website where the

5    defendant would then end up possibly selling something

6    directly to the plaintiff.

7              MS. SOUTHALL:  Correct.  Correct.  I mean, if you

8    look at the website, which is attached to the complaint --

9              THE COURT:  Right.

10             MS. SOUTHALL:  -- it says, "We are a market research

11   company for pharmaceuticals and others."  We don't sell

12   medical devices like the Stryker cases and things of that

13   nature.  I mean, the Arkansas case, the Davis case, and the

14   Phillips Randolph case really are on all fours.  And what's

15   interesting about Phillips Randolph is it cites Judge Bartles

16   opinion in Lutz, which I'm sure you are familiar with, which

17   remains good law.  So the two courts in this district which

18   have weighed in on the issue have found that faxes like this

19   are not advertisements.

20             THE COURT:  Right.  Okay.

21             MS. SOUTHALL:  So, you know, if you look at these

22   four cases, which are really the closest four to what we have,

23   Lutz, Phillips Randolph, Judge Stengel's recent opinion and

24   the Davis opinion, there are four reasons why this is not an

25   advertisement.  It's offering an opportunity to participate in

16

1    a research study in exchange for an honorarium.  It's not

2    offering a free good, it's not a free steak dinner, it's not a

3    free directory.  It's not attempting to market to plaintiff or

4    plaintiff's patients --

5            THE COURT:  And there is nothing on the website to

6    which plaintiff is directed that could in any way be

7    interpreted as an effort to sell anything to the plaintiff?

8            MS. SOUTHALL:  We're strictly business to business.

9    Plaintiff couldn't automatically participate in the study.

10   They have to answer a few threshold questions to make sure

11   they're a good fit for the study; it's something that's

12   specifically targeted, it's not a pretext.  As you just said,

13   the website just says we are a market research company, we're

14   not looking to sell you something else.

15       And the fax also -- if you look at the fax itself, it

16   doesn't say what Olson Research really does or who comprises

17   it's customer base.  So at the end of the day, we are a small

18   business which does market research for other businesses.

19   Plaintiff isn't going to hire us.  I mean, there's no reason

20   for him to, we don't have services that he would need.  His

21   patients are not going to hire us, we don't have services that

22   they need.  So we're not advertising to them.

23            THE COURT:  I'll probably have the same question for

24   Mr. Bock, but let's talk a little bit about this FCC rule,

25   okay?  Am I required to apply that or may I first or should I

17

1    first look to whether the definition of unsolicited

2    advertisement is, on the facts of this case anyway, ambiguous

3    before I even get to the FCC rule?  And I guess this, then,

4    gets into that Hobbs Act issue which Judge Stengel didn't talk

5    about, you guys didn't talk about, and then I read the Fourth

6    Circuit and I'm thinking what's this all about, right?

7              MS. SOUTHALL:  Right.  It's a law school question.

8              THE COURT:  Yes, it is.  And I didn't like them then

9    and I don't like them know.  So what role, if any, does the

10   FCC rule play in my analysis and eventual decision here?

11             MS. SOUTHALL:  Well, I think you start with the

12   language of statute, the language of the TCPA.  And that if

13   you look, the language of the statute says an unsolicited

14   advertisement is any material advertising a commercial

15   availability or quality of any property, goods or service

16   which is transmitted to any person without that person's

17   express invitation or permission.  And I think the FCC's

18   rulings are a nice overlay, and under their rule, this is not

19   an advertisement.

20             THE COURT:  Well the fax is -- unquestionably the

21   fax is a survey --

22             MS. SOUTHALL:  Correct.

23             THE COURT:  -- right.  And I guess your point would

24   be if the fax is a survey, then the only way it could be an

25   advertisement under the FCC rule is if it qualified as a

18

```
 1   pretext --

 2           MS. SOUTHALL:  Correct.

 3           THE COURT:  -- to an advertisement.

 4           MS. SOUTHALL:  Right.  It's not promoting a

 5   commercial product or service.

 6           THE COURT:  Right, okay.  Okay.

 7           MS. SOUTHALL:  So, I mean, you may not need to get

 8   there.  And maybe that's the reason Chief Judge Stengel didn't

 9   get there, because he didn't need to.

10           THE COURT:  I may not need to get there but -- your

11   position is A) I may not need to get there, and B) if I ever

12   have to, it's not an advertisement even if I apply the FCC

13   rule because the only way it could be one would be to be a

14   pretext and it is not.

15           MS. SOUTHALL:  Correct.

16           THE COURT:  What about the Hobbs Act?  Does that

17   divest me of jurisdiction from making that decision in the

18   first instance?

19           MS. SOUTHALL:  I don't think so.  I don't think so.

20           THE COURT:  Okay.  Okay.

21           MS. SOUTHALL:  And the petition that's pending

22   before the FCC from that M3 case is very interesting because

23   it's these four -- it's this type of case.

24           THE COURT:  Right.

25           MS. SOUTHALL:  You know, when you have a market
```

PAGE 113

19

```
 1   research survey, it's not an advertisement under the rule.  So
 2   I'm curious to see what Commissioner Pai does with that.
 3             THE COURT:  Now, you obviously haven't yet opposed
 4   plaintiff's motion for class cert.
 5             MS. SOUTHALL:  Right.
 6             THE COURT:  If the complaint survives dismissal,
 7   would you at some point oppose that or --
 8             MS. SOUTHALL:  I think we need to get into more
 9   facts first --
10             THE COURT:  Yes.
11             MS. SOUTHALL:  -- with the client --
12             THE COURT:  Okay.
13             MS. SOUTHALL:  -- on that.
14             THE COURT:  Okay.
15             MS. SOUTHALL:  I mean, we're really at this
16   threshold issue right now of --
17             THE COURT:  Have any of these cases ended up being
18   certified?
19             MS. SOUTHALL:  Yes.
20             THE COURT:  Okay.
21             MS. SOUTHALL:  In the consumer context definitely.
22   And there's a lot of cases out there --
23             THE COURT:  I mean in this context.
24             MS. SOUTHALL:  In this context --
25             THE COURT:  Yes.
```

20

1           MS. SOUTHALL:  -- I haven't seen one yet.  I don't

2    know if Mr. Bock has.

3           MR. BOCK:  I don't think so.

4           THE COURT:  Have any of them gotten that far yet?

5           MR. BOCK:  Not that I know of, Your Honor.

6           THE COURT:  Okay.  Okay.  Okay.  I didn't mean to

7    interrupt you --

8           MS. SOUTHALL:  No, that's okay, I'm done --

9           THE COURT:  Oh, you're done, okay --

10          MS. SOUTHALL:  -- unless you have some other

11   questions.

12          THE COURT:  -- well let me -- let me look.  Connor,

13   was there anything -- did you have any other questions?  Let

14   me look back through.  No, I don't think so either.  Let me

15   look quickly through.  I think the cases I read gave me more

16   questions for Mr. Bock than for you.  Okay.

17          MS. SOUTHALL:  Okay.

18          THE COURT:  Thank you very much.

19          MS. SOUTHALL:  Thank you.

20          MR. BOCK:  Good morning, Your Honor.  May it please

21   the court, Phillip Bock for plaintiff.

22          THE COURT:  Yes.  So the big issue -- one of the

23   distinctions does appear to be, let's start with Ms.

24   Southall's point that there is nothing that her client could

25   or would, at any point along the timeline, sell to your client

21

1    or his patients.  Is she incorrect, or if she is correct, why

2    isn't that dispositive of your case?

3              MR. BOCK:  She might be correct, but it's not

4    dispositive because the TCPA doesn't only prohibit advertising

5    to sell things to people, it also prohibits trying to buy

6    things from people.

7              THE COURT:  And that's --

8              MR. BOCK:  The <u>Sandusky v. Medco</u> case --

9              THE COURT:  Yes.

10             MR. BOCK:  -- which was one that said this isn't an

11   advertisement.

12             THE COURT:  Right.

13             MR. BOCK:  They said so to be an add, the fax must

14   promote goods or services to be bought or sold and it should

15   have profit as an aim.  Well, this fax --

16             THE COURT:  Where is that?

17             MR. BOCK:  -- is -- I'm sorry, Your Honor.

18             THE COURT:  No, no, no, do you have that specific

19   cite?

20             MR. BOCK:  Yes, I do.

21             THE COURT:  I have the opinion in front of me.

22             MR. BOCK:  It's 222, page 222.

23             THE COURT:  Of course I've got the Westlaw version

24   here.  Let me find 222.  Got it.  So material that advertises

25   something promotes it to the public as for sale.  Must be

22

1    commercial in nature.  All right, run that by me again now

2    because we have -- and is this your argument, that the fact

3    that they offered to pay your client $150 --

4              MR. BOCK:  Yeah, 200 bucks an hour --

5              THE COURT:  Now, explain that one a little more to

6    me.

7              MR. BOCK:  Okay, so this guy's a psychiatrist, he's

8    a medical doctor.  He provides opinions to people in exchange

9    for money, that's what he does; people pay him for his medical

10   opinions.  They send him a fax saying, hey, we will pay you

11   for you medical opinion; 200 bucks an hour, you fill out an

12   online survey.

13             THE COURT:  I thought it was $150 --

14             MR. BOCK:  It was 145 for 45 minutes.

15             THE COURT:  Okay, so --

16             MR. BOCK:  I'm not math guy --

17             THE COURT:  -- but are you claiming that the same

18   opinion that Olson is requesting through it's survey questions

19   is analogous to the opinions that your doctor provides his

20   patients?

21             MR. BOCK:  A difference in degree or, you know, one

22   those things.  It's not the same opinion, but they only want

23   Dr. Fischbein's opinions, and they want his opinions about

24   something that he knows as a professional, and they're trying

25   to buy them from him.  And he didn't know that.  Maybe if

23

1    somebody would send you something saying, hey --

2              THE COURT:  So how many --

3              MR. BOCK:  -- if you got any extra opinions --

4              THE COURT:  -- of these TCPA cases have been brought

5    by plaintiffs from whom marketers or sellers of products have

6    been seeking to buy something from them?

7              MR. BOCK:  That's a good question.

8              THE COURT:  Oh, it's a really good question.

9              MR. BOCK:  Well, look, I -- so --

10             THE COURT:  A potentially dispositive question.

11             MR. BOCK:  For good or bad, I do a lot of junk fax

12   cases, and I see a lot of junk faxes.  One of them I see all

13   the time is "We buy classic automobiles," "We buy used cars."

14             THE COURT:  Okay.

15             MR. BOCK:  Why don't we sue them?  We can't even

16   find them and they probably don't have any money, so --

17             THE COURT:  Well, those aren't --

18             MR. BOCK:  -- we're not going to waste people's time

19   --

20             THE COURT:  Neither one of those reasons really

21   carry a lot of weight with me in terms --

22             MR. BOCK:  But to me, it is an advertisement.

23             THE COURT:  -- of the analysis I have to do.  For

24   you trying to make a buck, I get that, but -- and I don't say

25   that disparagingly, all lawyers are trying to make a buck.

24

1   But let's get back to my question --

2           MR. BOCK:  But it's an advertisement because it's

3   offering to buy something from people.

4           THE COURT:  Yes, but okay, let's --

5           MR. BOCK:  Okay.

6           THE COURT:  -- gear it back a step.

7           MR. BOCK:  Okay.

8           THE COURT:  I understood the TCPA, and I had a lot

9   of work at the state level in a prior life on this, the people

10  calling up during dinner typically weren't asking to pay me --

11  at least I never got these calls -- weren't asking to pay me

12  to sell something to them.

13          MR. BOCK:  Maybe, they could -- yeah, I understand

14  what you're saying.  But a commercial transaction is two ways,

15  and their argument is that as long as the product is only

16  going this way, it's not an ad and --

17          THE COURT:  Well, I don't --

18          MR. BOCK:  -- if it goes that way, it is.

19          THE COURT:  -- know that that's their argument, I

20  think that that's what the statute says, right?  What does --

21  does the TCPA prevent someone from calling me to try to buy

22  something from me, like legitimately, not a scam --

23          MR. BOCK:  Yes, it does.

24          THE COURT:  -- to try to buy something from me.

25  Okay, what part of it --

1              MR. BOCK:  If they send you a fax.  It's any

2       material that's advertising the commercial availability or

3       quality of any property, goods or services.

4              THE COURT:  Yes, but don't you think the statute is

5       written from the perspective of it's the person sending you

6       the fax that's trying to sell something, that's advertising

7       something for sale, i.e. to get you to buy it?

8              MR. BOCK:  No.

9              THE COURT:  Why?  What basis do you have for saying

10      that?

11             MR. BOCK:  Because there's no reason to make that

12      conclusion.  My --

13             THE COURT:  Have any courts made the same conclusion

14      that you are making?

15             MR. BOCK:  Not that I'm aware of, but I know --

16             THE COURT:  In the country.

17             MR. BOCK:  -- that Sandusky specifically says for it

18      to be an add, the fax must promote goods or services to be

19      bought or sold.  And it must -- and it should have profit as

20      an aim.

21             THE COURT:  Okay.

22             MR. BOCK:  And that's the bad circuit opinion.  We

23      don't run into Chevron problems here because we agree it's a

24      commercial aim behind this fax.

25             THE COURT:  But again, don't you think, when it says

26

1   bought or sold, isn't that kind of two ways of covering the

2   same sort of transaction, i.e. the guy bugging you who's

3   trying to sell you something?

4          MR. BOCK:  Yeah, that's what they're doing here.

5   They're trying to bug you to buy something from you.

6          THE COURT:  I know, but that was a different

7   question.

8          MR. BOCK:  Well, bought or sold.  I don't -- I think

9   bought or sold --

10         THE COURT:  But isn't bought or sold two ways --

11         MR. BOCK:  -- are flip sides of the same --

12         THE COURT:  -- to try covering -- two ways to try

13  and cover the same thing, that is to prevent someone from

14  calling you to try to get you to buy something from them?

15         MR. BOCK:  That's not how I read it, no, Your Honor.

16         THE COURT:  Well, I know how you read it.

17         MR. BOCK:  No, I mean, I don't know how to --

18         THE COURT:  I'm more concerned with how I'm going to

19  read it --

20         MR. BOCK:  I know, I know.

21         THE COURT:  -- and I guess the question is I

22  understand your reliance on the language "bought or sold," and

23  my question is, and I think maybe you answered it but I want

24  to be sure, have there been any courts in the country -- and I

25  know you're a national practitioner in this area -- any courts

27

1    in the country which have dealt with purported TCPA violations

2    when the person contacting the consumer is trying to pay the

3    consumer for something as opposed to the money going the other

4    direction?

5              MR. BOCK:  I mean, the M3 decision denied a motion

6    to dismiss, I don't really remember the reasons right now, if

7    the judge said it was because they were trying to buy

8    something from the recipient or if it was because of the

9    possibility that somebody would be selling them something in

10   the future, which is something we argue here.

11             THE COURT:  Right.

12             MR. BOCK:  But they do advertise the commercial

13   availability of their surveying services.

14             THE COURT:  Of course they do.

15             MR. BOCK:  They say we do this, we have people who

16   pay us to send you this thing.

17             THE COURT:  Of course they do, but it's not your

18   client or his patients.  Nor, as I understand the structure of

19   their organization, could it ever be.

20             MR. BOCK:  I understand.  No, I understand.

21             THE COURT:  So you're conceding that there is no way

22   that your client or his patients could ever, at any point, be

23   able to, even if they wanted to, buy something from Olson,

24   correct?

25             MR. BOCK:  No, I wouldn't concede that.

28

1           THE COURT:  Okay, what could your client -- what is
2    Olson, in your view, purportedly selling or offering to sell
3    to your client or any of his patients?
4           MR. BOCK:  We don't allege that they're offering to
5    sell something to Dr. Fischbein or his patients, but I would
6    imagine if Dr. Fischbein had the money and wanted to
7    commission a paid survey, he could hire them.  They've told
8    him that that's what they do.  Maybe one of his patients is
9    into something like that and he says, hey, I got this fax,
10   this people -- you said you need somebody who send surveys out
11   --
12          THE COURT:  But why --
13          MR. BOCK:  -- I just saw something --
14          THE COURT:  Why would -- okay, that would be --
15          MR. BOCK:  He didn't know about it until --
16          THE COURT:  -- purely voluntary, I just --
17          MR. BOCK:  -- they sent the fax telling them.
18          THE COURT:  I'm trying to understand your theory of
19   the case.
20          MR. BOCK:  Well, the direct advertisement theory is
21   they are telling Dr. Fischbein that they will buy his valuable
22   medical opinions.  They're telling him --
23          THE COURT:  Right.
24          MR. BOCK:  -- about the quality and -- the
25   commercial availability and quality of services they will buy

29

1   from him, just like if they said --

2            THE COURT:  And your view --

3            MR. BOCK:  -- we buy used cars.

4            THE COURT:  Under your view of the TCPA, despite

5   apparently no court in the country having agreed with you to

6   this point except possibly the M3 decision, which we'll look

7   at more closely, your view of the TCPA is that someone who is

8   offering to pay your client for his very important wisdom is

9   violating the TCPA.

10           MR. BOCK:  Yes, they are --

11           THE COURT:  Okay.

12           MR. BOCK:  -- advertising the -- well, no court's

13  ruled against me because I haven't had a case --

14           THE COURT:  No, no, no --

15           MR. BOCK:  -- on this either but nobody's --

16           THE COURT:  -- my question was much more simple.

17  You're a national practitioner in this area.  I've seen your

18  name and that of your partner on many of the cases.  Are you

19  aware of any court in the country -- and I guess we're dealing

20  exclusively with federal courts obviously -- district or

21  circuit, that have held that the TCPA prohibits someone

22  calling you and offering to pay you something?  And I'm not

23  talking about a scam, I'm talking about a --

24           MR. BOCK:  I understand.

25           THE COURT:  Okay.

30

1            MR. BOCK:  I'm not aware of any yet, Your Honor.

2            THE COURT:  Well, doesn't that tell you something?

3            MR. BOCK:  No.

4            THE COURT:  Why not?

5            MR. BOCK:  There's only a few that go the other way

6       and they're district court opinions.

7            THE COURT:  What do you mean, go the other way?

8            MR. BOCK:  That have said they're not, that's not an

9       advertisement for some reason or not.

10           THE COURT:  But that didn't involve -- that involved

11      the nature of the services.  That didn't involve, nor was it a

12      material part of any court's analysis, that there was an offer

13      to pay the plaintiff.

14           MR. BOCK:  Right.  Well, the people have argued

15      that.  The one with the $15 honorarium, I think it was the

16      Phillips case in the Northern District of Illinois --

17           THE COURT:  Okay, but I --

18           MR. BOCK:  -- but I think they argued --

19           THE COURT:  -- know it's been argued --

20           MR. BOCK:  Oh, I'm sorry.

21           THE COURT:  -- I understand your views --

22           MR. BOCK:  I'm not aware of any case that's ruled in

23      my favor yet on this.

24           THE COURT:  Any case, and whether it's in your favor

25      or not --

31

1          MR. BOCK:  Okay.

2          THE COURT:  -- but any court who has looked at the

3    TCPA and says, oh, yeah, the statute was intended to prevent

4    me, seller, or me, caller, from calling you and saying, hey, I

5    want to give you $150 for something.

6          MR. BOCK:  I'm not aware of a case like that yet.

7          THE COURT:  Okay.  Okay.

8          MR. BOCK:  But I know that if Dr. Fischbein had sent

9    them a fax offering to sell them his opinions, it seems like

10   everybody would agree that's an advertisement.

11         THE COURT:  Well, that may or --

12         MR. BOCK:  Why isn't the flip side --

13         THE COURT:  -- may not be, but that's not what's

14   alleged, nor that's not what's at issue, nor does that have

15   anything to do with why the TCPA was enacted.  Just three

16   points --

17         MR. BOCK:  Well, why was the TCPA --

18         THE COURT:  -- off the top of my head in response to

19   yours.

20         MR. BOCK:  Well, no, I'm not arguing with Your

21   Honor, I'm just trying to make some points that aren't in the

22   brief.

23         THE COURT:  Well, yes, but --

24         MR. BOCK:  The scourge of --

25         THE COURT:  -- let's stick to -- forget the scourge.

32

1           MR. BOCK:  You know, why was the TCPA enacted?  Part

2    of those, the robocalls, those are people's houses --

3           THE COURT:  I understand all that, I understand all

4    that.

5           MR. BOCK:  But the faxes --

6           THE COURT:  But that has --

7           MR. BOCK:  -- are to business --

8           THE COURT:  Excuse me.

9           MR. BOCK:  I'm sorry, Your Honor.

10          THE COURT:  That has nothing to do with your

11   allegations.  Nothing, okay?  You don't even allege any

12   conduct like that, all right?  You allege one fax, okay, one

13   fax, one, that offered to pay your client money from a sending

14   entity that does not sell goods or services as part of it's

15   business to your client or any of his patients.  Those are the

16   facts of your case as you have alleged them, okay?

17          MR. BOCK:  Okay.

18          THE COURT:  And whether your client might someday

19   want to call up Olson and say I'd like to buy your survey,

20   that's irrelevant.  So let's get back to your allegations and

21   why it's a violation of the TCPA and doesn't this -- name me

22   another case which has this fact pattern, which survived a

23   motion to dismiss under the TCPA, on your theory that -- and

24   when I say this fact pattern, I'm zeroing in on your theory

25   that by offering to pay your client money it ipso facto turned

33

1    it into a TCPA case.

2              MR. BOCK:  I can't, Your Honor.

3              THE COURT:  Okay.  Okay.  And in fact, that would

4    make your case much weaker than Mauthe, wouldn't it?

5              MR. BOCK:  Why?  Why would it be weaker?  Oh,

6    because of the offer to --

7              THE COURT:  Yes.

8              MR. BOCK:  Well, in Mauthe --

9              THE COURT:  Because that seems to be one of your --

10             MR. BOCK:  -- they weren't offering to sell or buy.

11             THE COURT:  -- seems to be one of your theories

12   here.

13             MR. BOCK:  No, in Mauthe they weren't offering to

14   buy or sell, it was the follow-up survey, how did we do, and

15   the judge said that's not an advertisement because that's

16   normal --

17             THE COURT:  But your point here is what they are

18   offering to buy or sell is specifically that they're offering

19   to buy your client's valuable opinion.

20             MR. BOCK:  And only his.  It says specifically on

21   there it's just to him, anybody else that fills it out,

22   they're not paying anybody else, only him.  They've decided

23   they want his opinion and he sells his time as -- you know,

24   they sent it to his business because of his business about his

25   business.  And the TCPA, you know, it uses broad words.  It

34

1    says any person, it doesn't say advertising the sale of

2    something to somebody who will buy it or might want to buy it.

3    They're making the statute too specific when what it was

4    supposed to do was prevent and stop advertising by fax without

5    permission.

6              THE COURT:  Well --

7              MR. BOCK:  If you want to send a fax, get

8    permission.

9              THE COURT:  I understand all of that.

10             MR. BOCK:  Okay.

11             THE COURT:  I understand.  How about how do you

12   respond to am I required to apply the FCC rule or may I first

13   look to whether the statute defines what happened here as an

14   unsolicited advertisement?

15             MR. BOCK:  I'm not sure.  That's not something I

16   considered because I think our argument fits both.

17             THE COURT:  How does your argument fit both?  If we

18   go the FCC rule, okay, how does your argument make this a

19   violation of the statute under the FCC's interpretation?

20             MR. BOCK:  That this fax, Your Honor, was sent with

21   a commercial purpose.  There's a commercial aim.  It's not

22   transactional or informational, it's -- there's a commercial

23   motivation.  It's their business for their paying client to my

24   --

25             THE COURT:  Where does commercial motivation --

35

1            MR. BOCK:  That's discussed --

2            THE COURT:  -- take priority over the language of

3       the statute requiring an advertisement for sale of goods or

4       services?

5            MR. BOCK:  In the definition it says commercial

6       availability or quality.

7            THE COURT:  Okay, where are we looking?

8            MR. BOCK:  That's the TCPA definition, 227(a)(5),

9       definition of unsolicited advertisement.

10           THE COURT:  "Any material advertising the commercial

11      availability or quality of any proper goods" -- but I guess as

12      a simple matter of statutory construction, we're talking about

13      advertisements.  How could Olson, in contacting your client,

14      be advertising the commercial availability or quality of any

15      property, goods or services that Olson might purport to sell?

16      That's what the statute was designed to prevent.

17           MR. BOCK:  Well, I try not to disagree with judges,

18      but you said that --

19           THE COURT:  No, that's what you're here for.

20           MR. BOCK:  You said the statute's intended to

21      prevent them from trying to sell something to my person, my

22      plaintiff, and I disagree with that.  I don't think that's

23      what the statute says.

24           THE COURT:  Well, what we're talking about -- and

25      you're here to disagree with me, don't worry about it.  But

36

1    the act provides a definition:  "Advertisement as any material

2    advertising the commercial availability or quality of any

3    property, goods or services."  How could Olson be advertising

4    to Dr. Fischbein the commercial availability or quality of any

5    property, goods or services, even under your definition, that

6    Dr. Fischbein could sell them?  How could somebody purporting

7    to buy something be calling the purported seller and

8    advertising what the purported seller has for them to buy?

9    That makes --

10           MR. BOCK:  I understand what you're saying.

11           THE COURT:  Yes.

12           MR. BOCK:  That's the how are they advertising

13   Fischbein's services to himself.  They're telling him that he

14   can sell his opinions --

15           THE COURT:  Well, they're not advertising

16   Fischbein's services to himself.  If your point is that they

17   want to buy them, they're obviously advertising Fischbein's

18   services to them.  How is that possible?

19           MR. BOCK:  It's advertising the commercial

20   availability or quality; they're making him aware of a

21   commercial opportunity to sell them his opinions.  They're

22   also making them -- him aware of the availability of their

23   commercial thing.  It's not that they have --

24           THE COURT:  Well, they don't have any commercial

25   things.  They're not asking him to buy --

37

1             MR. BOCK:  No, I know that.

2             THE COURT:  You can't have it -- I guess what I'm

3    saying is you can't have it both ways, right?  If you're

4    saying that the violation of the statute is triggered by them

5    offering to buy something from him and that that's the

6    commercial transaction, then what you're telling me to focus

7    on is what could conceivably be advertised in that commercial

8    transaction.  Because you'll agree that the words commercial

9    activity do not subsume the prerequisite of whether or not

10   it's an advertisement, correct?  Commercial activity falls

11   within the discussion of an advertisement.

12            MR. BOCK:  Right.

13            THE COURT:  Okay.  So under your theory, what is

14   Olson advertising to Dr. Fischbein?  What --

15            MR. BOCK:  Well, two things --

16            THE COURT:  -- are they making him aware of that he

17   already doesn't know -- that he doesn't already know?

18            MR. BOCK:  That they will pay him -- one of them is

19   that they will pay him to participate in a survey, and pay him

20   and only him, based on his professional knowledge; they will

21   buy his knowledge from him to sell it somebody else.

22            THE COURT:  And that offends him?

23            MR. BOCK:  Well, I don't know if it offends him.

24   You know, doctors and pharmacies still get tons of junk faxes

25   because companies know that their fax machines are ready to

38

1    receive them.  Because of HIPAA they can't use email and that

2    sort of thing.

3              THE COURT:  Right.

4              MR. BOCK:  I don't know if these offend them,

5    because I haven't seen him in a deposition, but I have watched

6    doctors and pharmacists tell me or say in a deposition that,

7    yeah, I'm sick of getting these things.  We have a fax

8    machine, we only want to receive the things for our business -

9    -

10             THE COURT:  Okay.

11             MR. BOCK:  -- we don't want to receive their

12   business.  They could send it in the mail, this isn't a claim

13   that they can't communicate --

14             THE COURT:  Just don't use a glassine envelope.

15             MR. BOCK:  Well, it if has patient information,

16   right, yeah.

17             THE COURT:  Okay --

18             MR. BOCK:  You know, the other thing is -- one other

19   point --

20             THE COURT:  -- I'm not -- this is for fleshing out -

21   -

22             MR. BOCK:  I know, I understand.

23             THE COURT:  -- how I'm struggling --

24             MR. BOCK:  I'm not taking it personally --

25             THE COURT:  -- I'm not trying to give you a hard

39

1    time.

2            MR. BOCK:  -- I just don't want to make you mad by -

3    -

4            THE COURT:  You don't make me mad.

5            MR. BOCK:  -- being argumentative.

6            THE COURT:  There's nothing you can do to make me

7    mad.  But --

8            MR. BOCK:  One other --

9            THE COURT:  -- you can see how I'm struggling with

10   this.

11           MR. BOCK:  Oh, I understand --

12           THE COURT:  Yes.

13           MR. BOCK:  -- I understand.

14           THE COURT:  Okay.

15           MR. BOCK:  One other point is this -- the statute

16   doesn't -- it says any person, it doesn't say the right

17   person.  So it doesn't become an advertisement based on who's

18   holding it or who receives it.

19           THE COURT:  Do you agree that the fax was a survey?

20           MR. BOCK:  No.  No, it's promoting a survey.  The

21   survey is something you have to go find somewhere else.

22           THE COURT:  Okay.

23           MR. BOCK:  It's advertising this opportunity,

24   commercial opportunity.

25           THE COURT:  And the commercial opportunity is,

40

1    again, for your client to be paid to offer his opinion.

2              MR. BOCK:   That's one of them.   I think it's also an

3    advertisement for them to send faxes to people saying that

4    they're in business for paying customers conducting surveys.

5              THE COURT:   Okay.   So I'm not sure -- I forgot how

6    you might have answered my question.   Am I to first look to

7    the FCC rule or am I to focus first on the language of the

8    TCPA?

9              MR. BOCK:   I think you first read the TCPA language

10   --

11             THE COURT:   Okay.   And do I then only go to the FCC

12   rule if I find that the TCPA language is ambiguous?

13             MR. BOCK:   Well, that depends on which appellate

14   justice -- judge you ask, right?   I don't know.   I think that

15   you --

16             THE COURT:   Well, there's no appellate judges here.

17             MR. BOCK:   Because I don't think they conflict, I

18   don't think it's --

19             THE COURT:   Okay.

20             MR. BOCK:   -- an issue in this case.   But if the FCC

21   opinion conflicts with the unambiguous reading of the statute,

22   I think that is a Hobbs Act problem, and somebody has to

23   initiate a Hobbs Act challenge, even though the FCC has

24   exceeded it's authority by saying something that contradicts

25   the unambiguous language.

41

```
 1              THE COURT:  Then let's turn to Ms. Southall's point.
 2    Her points are, one, under the plain language of the TCPA this
 3    was not an advertisement.  So the FCC rule aside, it's not an
 4    advertisement, but that even I were to analyze the FCC rule,
 5    the complaint should still be dismissed because the only way
 6    that it could be an advertisement is that it would have to
 7    serve as a pretext to an advertisement under the FCC rule,
 8    right?  The rule looks at three types of communications:
 9    Promotions for goods or services, informational faxes and
10    surveys.  So let me understand your argument with respect to
11    the rule.  Are you contending that it is one of those three?
12    Obviously you're not contending that it's an informational
13    fax, are you?
14              MR. BOCK:  No, right, correct.
15              THE COURT:  Okay.  Are you -- so you are contending
16    that the fax itself is a promotion for goods or services?
17              MR. BOCK:  Yes.
18              THE COURT:  Okay.  And you are contending it is not
19    a survey?
20              MR. BOCK:  True, we are not -- we did not allege
21    this is a survey.
22              THE COURT:  Okay, so you are contending what the
23    Olson folks are calling a survey is really a promotion for
24    goods or services.  So you would have me look at the FCC rule
25    under that first prong, if you will, promotion for goods or
```

42

1    services is number one; informational fax, number two; survey,

2    number three.  You would have me assess the rule in the

3    context of this fax being a promotion for a good or service?

4              MR. BOCK:  Yes.

5              THE COURT:  Okay.  And so you would not have me even

6    consider -- and I want you to think this through because I

7    thought it was -- I think you get into this in your brief.

8    Are you not arguing that this is therefore a pretext to an

9    advertisement?  Because I believe the pretext argument kicks

10   in only when we're talking about a survey, is that correct?

11   Connor, would you agree with that?

12             THE CLERK:  (Indiscern.).

13             THE COURT:  Okay.  Okay.  So it's not necessarily

14   limited.  Okay.  Even though that's the way the rule is

15   written.  Okay.  So I think what Mr. Maloney was saying to me,

16   Mr. Bock, is that in Sandusky, he reminded me, that they did a

17   pretext analysis with respect to an informational fax.  So

18   let's assume that the pretext analysis we can do in the

19   promotion of goods or services, right?  So the survey, in your

20   view, promotes goods or services.  And again, please explain

21   to me how.  And I'm sorry if I'm asking you to be repetitive.

22             MR. BOCK:  Oh, no, that's okay.  So our argument is

23   the fax advertises the commercial availability or quality of

24   plaintiff's services.

25             THE COURT:  Okay.

43

1           MR. BOCK:  Or that it advertises the commercial

2    availability of their services that they sell to other people.

3           THE COURT:  And that would be as a pretext?

4           MR. BOCK:  That would be as an unsolicited

5    advertisement of their -- availability of their -- commercial

6    availability of their services.

7           THE COURT:  That they sell to other people.

8           MR. BOCK:  Yep.

9           THE COURT:  Not to your client or his patients.

10          MR. BOCK:  Right.

11          THE COURT:  Okay.

12          MR. BOCK:  It shouldn't make a difference that they

13   send a fax to everybody but their customers.

14          THE COURT:  Well, remember, the purpose of the TCPA

15   is not to eliminate annoying faxes --

16          MR. BOCK:  Right.

17          THE COURT:  -- it's to eliminate those faxes or

18   communications, telephone calls, for example, where people

19   trying to sell something are calling you.  Of course there's a

20   whole separate category, there's political pollsters, there's

21   charitable, there's all sorts of exemptions, okay.  But why

22   would you have me interpret the TCPA or the intent of Congress

23   to be to prevent someone from contacting you when the person

24   contacting you sells it's goods or services to third parties?

25          MR. BOCK:  Because it says don't sent advertisements

44

1    without permission, and that's an advertisement of the

2    commercial availability of theirs.  But we have this

3    fundamental disagreement that we won't -- you're the judge so

4    we won't --

5              THE COURT:  No, no, no --

6              MR. BOCK:  -- agree.

7              THE COURT:  -- our disagree --

8              MR. BOCK:  I don't agree it has to be trying to sell

9    my guy something --

10              THE COURT:  Okay.

11              MR. BOCK:  -- they shouldn't -- people should not --

12    under the words of the statute, they should not be able to

13    send faxes saying we want to buy your used office equipment,

14    we want to do this, we want to buy your house, we want to buy

15    your used car, we want to buy your presence at a seminar or

16    anything else --

17              THE COURT:  Okay.

18              MR. BOCK:  -- it shouldn't -- that's the --

19              THE COURT:  If I were to disagree with you and find

20    that in fact that's not really what the statute is designed to

21    prevent, i.e. someone calling to buy your stuff.  And again,

22    we're talking about legitimate calls.  There's no allegation

23    that this is a scam, that they wouldn't have paid you the

24    money, right --

25              MR. BOCK:  Right, correct.

45

1         THE COURT:  -- I mean, we're separating that out

2    from scams.  If I were to disagree with you on that -- and

3    this is a Q&A, my mind's not made up.  If I were to disagree

4    with you on that, does that mean that you lose the case?

5         MR. BOCK:  Well, if you disagree that an

6    advertisement to buy my client's time or opinions isn't an

7    advertisement, then we have another argument, which is that

8    they're advertising the availability of their services, albeit

9    things that they sell to special -- you know, for only

10   pharmaceutical --

11         THE COURT:  Sure.

12         MR. BOCK:  -- companies.

13         THE COURT:  To their own clients.

14         MR. BOCK:  Yeah.

15         THE COURT:  Okay.  So let me ask you the question

16   with respect to -- well, I'll call that your second theory.  I

17   don't disparage it, I mean, that's your second theory; you

18   have the one theory we've dealt with, now we're on to the

19   second theory of so that they can sell to their own clients,

20   not to your client.  Have any courts, to your knowledge, found

21   that theory to be a violation of the TCPA where the -- and I

22   won't call them the selling party, but the contacting party is

23   seeking information from the recipient of the fax, and that

24   information, whether I'm paying you for it or not, is then

25   used to help the sender of the fax to make money with it's own

1    clients.  Have there been any judicial decisions saying that

2    that's a violation of the statute under those facts?  To your

3    knowledge.

4          MR. BOCK:  There's been a few courts to deny motions

5    to dismiss --

6          THE COURT:  On that argument?

7          MR. BOCK:  Yeah.  The one I'm thinking of is <u>Mussat</u>.

8          THE COURT:  Okay.

9          MR. BOCK:  No, I lost in the Michigan -- District

10   Court of Michigan on <u>Fulton v. Enclarity</u>; it's against

11   LexisNexis.

12         THE COURT:  Okay.

13         MR. BOCK:  And that's briefed and waiting for an

14   opinion from the Sixth Circuit.

15         THE COURT:  Okay.

16         MR. BOCK:  Meanwhile, somebody then filed a case in

17   the Northern District of Illinois, and that judge there denied

18   the motion to dismiss.  And the facts there said here's the

19   information we have about you, please update it so we can make

20   sure the database that we sell to people is correct.

21         THE COURT:  Okay.

22         MR. BOCK:  And so that's a similar --

23         THE COURT:  And the court --

24         MR. BOCK:  -- opinion to what you're saying.

25         THE COURT:  The court denied a motion to dismiss on

47

1    those facts.  And did the court -- and what opinion was that

2    again?

3              MR. BOCK:  It's <u>Mussat</u>, M-U-S-S-A-T, Northern

4    District of Illinois.  I don't --

5              THE COURT:  Relatively recent?

6              MR. BOCK:  -- have the cite --

7              THE COURT:  Last couple years?

8              MR. BOCK:  It was either this year or late last

9    year.

10             THE COURT:  Okay.  What was the court's reasoning

11   there, if you recall?

12             MR. BOCK:  I don't recall.

13             THE COURT:  And if you don't recall -- we'll pull

14   the opinion, we'll look at it.

15             MR. BOCK:  Yeah, I don't recall.

16             THE COURT:  I've seen the name of the case.  I

17   didn't -- but I have not read that opinion.  Okay, all right,

18   that's fair.  All right.  Is there anything -- I have some

19   more questions, but I don't -- if there's other argument you

20   want to make, I want to get back into your flow there and I'll

21   --

22             MR. BOCK:  No, I just haven't seen any opinions that

23   come to mind that say a fax is an advertisement depending on

24   who receives it, you know, who's the target audience.

25             THE COURT:  Let me ask you a more specific question,

48

1    and I don't know if your prior answer satisfies this question;

2    it might, it might not.  So in your briefing, one of your

3    arguments is that the fax served as a pretext for future

4    advertisements because Olson's privacy policy stated that

5    personal information may be provided to its clients if that

6    possibility is disclosed at the outset of the survey and the

7    survey participant, meaning Dr. Fischbein, consents to the

8    defendants doing that.  How could the fax, in this case, serve

9    as a pretext for future advertisements if Dr. Fischbein did

10   not participate in the survey and his consent to disseminate

11   that information would have been required?

12          MR. BOCK:  So it would be a pretext only to people

13   who participate?

14          THE COURT:  So --

15          MR. BOCK:  Is that what you mean?

16          THE COURT:  -- did Dr. Fischbein --

17          MR. BOCK:  No, he didn't.

18          THE COURT:  Okay, then it's not a pretext as to him?

19          MR. BOCK:  It's still a pretext to get people to

20   respond, and thereby you know that they are people who

21   respond.

22          THE COURT:  But if you said it's only a pretext with

23   respect to those people who participate, and you've just told

24   me Dr. Fischbein didn't participate --

25          MR. BOCK:  Yeah, I didn't mean to say that if I did.

49

```
 1              THE COURT:  Okay.
 2              MR. BOCK:  I didn't mean to say it's only the people
 3    who participate --
 4              THE COURT:  Okay.
 5              MR. BOCK:  -- to whom it is a pretext, but the
 6    people who do participate have their information -- you know,
 7    they said they won't directly market --
 8              THE COURT:  Well, the way I understand it, that Dr.
 9    Fischbein would be offered the opportunity to provide his
10    consent.
11              MR. BOCK:  That's, yeah, one part of it.
12              THE COURT:  And if he didn't provide his consent,
13    how could it be a pretext for future advertisements?
14              MR. BOCK:  Well, it says they won't -- I mean, this
15    might not be directly responsive, but it says they won't
16    directly market products.  It doesn't imply that they would
17    indirectly market them.  So they won't tell -- my reading of
18    these words on their privacy policy is that they won't tell
19    somebody Dr. Fischbein participated, but they might tell them
20    that his medical practice is somebody that likes to get
21    information or something like that.  But I don't know whether
22    they do that, I just know that their privacy policy makes it
23    possible for them to indirectly give your information so
24    people can indirectly market it to you, so not to Dr.
25    Fischbein in particular individually, but to his practice
```

50

1    generally --

2              THE COURT:  Are we talking about the names of Dr.

3    Fischbein's patients?

4              MR. BOCK:  No.

5              THE COURT:  Okay.

6              MR. BOCK:  No.

7              THE COURT:  So we're just talking about Dr.

8    Fischbein.

9              MR. BOCK:  Right.

10             THE COURT:  Okay.  So if Dr. Fischbein provided his

11   consent, what are you then saying could happen?

12             MR. BOCK:  Oh, if he consented, then they -- they're

13   saying we won't -- people won't get your personal information

14   from us to directly market to you unless you give us your

15   permission.

16             THE COURT:  To directly market to you.  Okay.  So if

17   Dr. Fischbein, and he didn't, give his personal information,

18   then you're saying that Olson, by the terms -- as you've

19   alleged it and as you've attached it to your complaint, by the

20   terms of their own document, could not advertise anything to

21   Dr. Fischbein, correct?

22             MR. BOCK:  Well --

23             THE COURT:  And the question then that begs is how

24   could this be a pretext for future advertisements if it's

25   contingent upon your client's consent and he didn't give it?

51

1           MR. BOCK:  It would be -- yeah.  The one part is the

2    direct marketing, so direct marketing to Dr. Fischbein versus

3    marketing to -- say his medical practice has 50 people.

4    They're not saying they won't sell his information so that

5    somebody knows that that practice will --

6           THE COURT:  I don't -- you're dodging the question,

7    I think.

8           MR. BOCK:  Okay, I'm sorry.

9           THE COURT:  That's okay.  And if I -- Ms. Southall,

10   am I interpreting this incorrectly?  Because I may be.

11          MS. SOUTHALL:  No, you're not.

12          THE COURT:  Okay.  So as I understand it, before

13   Olson could advertise or provide to it's clients anything --

14   let me read this correctly.  "Defendant's privacy policy

15   states that if personal information may be provided to Olson's

16   clients if that possibility is disclosed at the outset of the

17   survey and the survey participant consents."  Okay.  So we

18   know that Dr. Fischbein did not consent.  If Dr. Fischbein did

19   not consent or participate in the survey, how could the fax in

20   this case serve as a pretext for future advertisements?

21          MR. BOCK:  It would only be if he did participate.

22          THE COURT:  Did he?

23          MR. BOCK:  No.

24          THE COURT:  Okay.  So you've just said that this --

25   therefore, on the facts as you allege them, this could not be

52

1    a pretext for future advertisements.

2              MR. BOCK:  I hope not, but --

3              THE COURT:  Well --

4              MR. BOCK:  It's like it could be an advertisement

5    even if he doesn't buy something.  Say they were advertising

6    to sell him something, he doesn't buy it, it's still a -- they

7    tried to -- they still advertised to him.  They're trying to

8    get people to respond to the survey.  The people who do

9    respond apparently will -- are going to be open to indirect

10   marketing --

11             THE COURT:  If they consent.

12             MR. BOCK:  No, that's the direct marketing.

13             THE COURT:  How are you defining indirect marketing?

14             MR. BOCK:  They say we will -- personal information

15   will never be used to directly market products, and then they

16   give a definition of this personally identifiable information,

17   it says, "To identify, contact or locate a single person or to

18   identify an individual."  So that's -- the directly would be

19   to Fischbein himself.  I don't know if this company does this,

20   but even under the words of this, if you participate --

21             THE COURT:  Well, wait a minute --

22             MR. BOCK:  -- they can sell a list and just don't

23   have the person's name on there.  But it does say --

24             THE COURT:  For purposes of your complaint, don't

25   you need to know if this company does this or not?  You just

1    said you don't know if this company does this or not.  Have

2    you not made the allegations that they have?

3                MR. BOCK:  That they do sell the information?

4                THE COURT:  Yes.

5                MR. BOCK:  Well, they say that they won't sell it

6    under certain circumstances.  They will never sell your

7    personally identifiable information, which implies that they

8    would sell the stuff that isn't personally identifiable.

9                THE COURT:  I got to get back to this, and I do so

10   at my own peril.  I want to look at Sandusky.  The Sixth

11   Circuit held that to be an ad, the fax must promote goods or

12   services that are for sale, promote goods or services that are

13   for sale, and the sender must have profit as an aim.  Okay.

14   And going back to your argument, you are saying that, one, the

15   fax was promoting goods or services -- the fax was somehow

16   promoting your client's services for sale, or alternatively,

17   that this was a pretext for advertisements to Olson's clients,

18   correct?

19                MR. BOCK:  Well, the pretext part would be a pretext

20   for getting -- for sending future advertisements.

21                THE COURT:  To Dr. Fischbein?

22                MR. BOCK:  Yeah.  That's that argument.

23                THE COURT:  Okay.

24                MR. BOCK:  So the quote I have from Sandusky is --

25                THE COURT:  Let's stick with the one I have --

54

1            MR. BOCK:  -- to be bought or sold --

2            THE COURT:  -- it makes for a better question.  "To

3       be an ad, the fax must promote goods or services that are for

4       sale."  And you still read that as an interpretation of the

5       statute that could mean that it would be somehow legally

6       possible for Olson, in contacting your client, to be at the

7       same time promoting the sale of his services.

8            MR. BOCK:  To them, yeah.

9            THE COURT:  Okay.

10           MR. BOCK:  I mean, they're telling him about the

11      commercial -- advertising the commercial availability or

12      quality --

13           THE COURT:  Why would they need to tell him about

14      the commercial availability of his services?  He sells his

15      services, as you point out, every day to his clients.  What

16      part of the commercial availability of his services doesn't he

17      get?

18           MR. BOCK:  That they're willing to pay him $150 to

19      do a 45 minutes survey based on his professional knowledge of

20      neurological issues.

21           THE COURT:  And that's something that never would

22      have occurred to him, absent their fax?

23           MR. BOCK:  I don't know.  I mean, they're -- whether

24      or not he knows about it, they're the ones sending him a fax

25      offering to buy his services.

1              THE COURT:  Okay.

2              MR. BOCK:  That's the bought or sold in the <u>Sandusky</u>

3     quote --

4              THE COURT:  I get you.

5              MR. BOCK:  -- I think it is flip sides of the same

6     coin.  It doesn't matter which way the sale will occur --

7              THE COURT:  Well, it must matter because on the one

8     hand, you know, the TCPA has been, can we say, actively

9     litigated for 27 years, actively litigated.  And there are 93

10    judicial districts in America.  And you're telling me that you

11    are unaware of any federal court case which has interpreted

12    the TCPA in that fashion.

13             MR. BOCK:  I don't -- yeah.

14             THE COURT:  Okay.

15             MR. BOCK:  Possibly.

16             THE COURT:  Where's the interaction, if any, the

17    interplay, if any, between that theory and Rule 11?

18             MR. BOCK:  I mean, this is an advertisement, I don't

19    --

20             THE COURT:  I know, I mean --

21             MR. BOCK:  -- there haven't been --

22             THE COURT:  -- don't you have to have some good

23    faith basis to assert that by contacting someone and offering

24    to pay them for their service you've violated the TCPA?  Don't

25    you have to have -- and after 27 years of extensive litigation

56

1    and countless individual and class actions in this area, that

2    there would have to be something upon which you could base

3    such a theory?

4              MR. BOCK:  Well, there's a couple parts to that.

5              THE COURT:  Okay.

6              MR. BOCK:  First is that the statute has not been

7    actively litigated since it was enacted.

8              THE COURT:  Really?

9              MR. BOCK:  No.

10             THE COURT:  Have you seen --

11             MR. BOCK:  It wasn't until much later --

12             THE COURT:  Have you seen the docket in our court?

13             MR. BOCK:  Well, I've just been working on these

14   cases for a long time --

15             THE COURT:  Okay.

16             MR. BOCK:  -- so I know --

17             THE COURT:  Well, you know what, I'm going to defer

18   to you.

19             MR. BOCK:  I'm not saying I'm an expert, I'm saying

20   --

21             THE COURT:  No, but you've seen them more than I

22   have.  I've seen them in many contexts in four years, but --

23   and I'm not being sarcastic -- I think you have a longer view,

24   that's correct.

25             MR. BOCK:  And I don't know when they started

57

1   sending faxes offering doctors the ability to be paid to

2   participate in a survey.  I don't know that it occurred prior

3   to a few years ago.

4           THE COURT:  That's a good point also.  All right.

5           MR. BOCK:  I know there's an opinion from a judge in

6   this district that said advertising to higher appellate

7   specialist lawyers isn't an advertisement.

8           THE COURT:  Is not?

9           MR. BOCK:  Because it's an employment opportunity or

10  something.

11          THE COURT:  Okay.

12          MR. BOCK:  There's the Phillips case from the

13  Northern District is an older case, but other than that, there

14  haven't been that many cases.  I think it's a -- not only do I

15  think it's a fair interpretation of the words of the statute,

16  I think it's the only correct one, that it doesn't matter

17  whether you're trying to sell or to buy, if you advertise a

18  commercial opportunity --

19          THE COURT:  I hear you --

20          MR. BOCK:  -- you know, that's --

21          THE COURT:  -- I hear you.

22          MR. BOCK:  -- the Turza case --

23          THE COURT:  I hear you, but in the context of at

24  least my understanding of the purposes behind this law, I'm

25  just having a difficult time personally squaring that

58

1    interpretation with Congress' intent in this area, at least as

2    I understood it prior to this morning.  That's all.  But as

3    you point out, we have a disagreement on that, but I think as

4    you've also pointed out, while that disagreement, if I end up

5    deciding that way, may hurt your case, it won't be dispositive

6    to your case on your second theory of the pretext, correct?

7             MR. BOCK:  Correct.

8             THE COURT:  Okay.

9             MR. BOCK:  Or the advertising of their stuff.

10            THE COURT:  So let's turn just -- so the fax directs

11   Dr. Fischbein to Olson's website portal so that he can log in

12   and complete the survey.  And what services do you allege the

13   website portal advertises?  What goods or services do you

14   allege the website itself advertises?

15            MR. BOCK:  None.

16            THE COURT:  Okay.  And on the conversion claim, what

17   facts do you allege that allow me to infer that Olson

18   willfully interfered with your client's control over his fax

19   machine, paper and toner?

20            MR. BOCK:  That they sent him a fax on purpose and

21   commandeered his fax machine and stole his paper and toner for

22   their information -- their message.

23            THE COURT:  How much value are you placing on -- how

24   much paper did he use in that one fax?

25            MR. BOCK:  I believe it's just one page.

59

1          THE COURT:  Okay, so we have one page of paper.  And
2    how would you break down the amount of toner that you think
3    was used to print that one page of paper?
4          MR. BOCK:  A minimal amount.  I don't know how much.
5          THE COURT:  Cents?
6          MR. BOCK:  Let's say less than a dollar for the
7    piece of paper and the toner.  We also allege that it wasted
8    his time.
9          THE COURT:  How much time do you think it took for
10   him to read one page, if he read it at all?  Do you think he
11   spent nearly as much time reading that one page as he did
12   hiring counsel?
13         MR. BOCK:  I doubt that it took him very much time.
14         THE COURT:  Okay.
15         MR. BOCK:  Some courts have said you can't have a
16   conversion claim for a de minimis injury and some courts have
17   said you can if you're in a, you know this -- I don't know
18   whether they were all cited but there's cases going both ways
19   on that.
20         THE COURT:  Okay.  Okay.  Connor, was there anything
21   further that you think we should inquire?  Okay.  Anything
22   further you'd like to say?
23         MR. BOCK:  No, Your Honor.
24         THE COURT:  Ms. Southall, anything further you'd
25   like to say?

PAGE 154

60

1            MS. SOUTHALL:  No, Your Honor.

2            THE COURT:  All right.  Well, as I say -- thanks for

3      the FCC petition, petition to the FCC.  We'll look at this.

4      And not knowing the breadth of the Third Circuit's potential

5      opinion, okay, in Judge Stengel's case, and I, like you, see

6      ways that this case is different.  Candidly, I don't know that

7      they're better for you, but they're different.  And I do

8      disagree with your theory, and in a vacuum, if this case

9      wasn't pending upstairs, this would probably be a fairly

10     straightforward decision for me, okay.

11          But there are these issues of Chevron deference, which

12     has been a topic of concern to our circuit and other circuits.

13     And whether this Hobbs Act is something that comes into play

14     here, whether I look at the FCC rule first or whether, as the

15     Sixth Circuit did, I decide that I don't need to, and

16     realizing the potential for a precedential opinion from our

17     circuit, which has that court weighing in on either an

18     agreement with or disagreement with the Fourth Circuit, among

19     others, it just doesn't make sense for me to try to anticipate

20     how the court's going to come out on all that.  And given that

21     -- and I know you're involved in that other case, I mean, I'm

22     taking this case off a fast track, and I never like to do

23     that.  But it just doesn't make much sense.  And I think I'm

24     going to be in a much better position to see if I'm missing

25     something by having the Third Circuit kind of lay this all

61

1   out.  And Mr. Maloney and I have talked about this.  We came

2   to this conclusion a bit grudgingly because I don't like to

3   put things in suspense.  This case actually presents a very

4   valid reason for me doing so, and I'd like to do that.  Let me

5   enter an order to that effect.

6       We'll monitor the Third Circuit, but clearly, when the

7   opinion comes down, perhaps we'll put this in the order as

8   well, within X days of that opinion coming down, maybe have

9   both of you submit -- and it could even be a letter brief --

10  as to how you think the Third Circuit's opinion affects the

11  pending motion.

12          MR. BOCK:  Okay.

13          THE COURT:  Is that okay?  Again, not my first

14  choice, but given the circumstances, it just -- because even

15  if I'm right, even if my decision is consistent with the core

16  of the Third Circuit's view of Judge Stengel's decision, there

17  may be other issues that the circuit touches on that I will

18  have needed to address.

19          MS. SOUTHALL:  That makes sense.

20          THE COURT:  Okay.  Okay.  I appreciate that.  I

21  appreciate you coming in.  I know you've been traveling.

22          MR. BOCK:  Thank you for having me.

23          THE COURT:  And I'm sorry we had to do it this week.

24  It wasn't my favorite week to drag lawyers into a courtroom,

25  but it worked for both of you.  So let's do it that way, and

62

1    then, as I say, Connor, we can talk about whether it would

2    make sense for the order to then require counsel, in case we

3    forget it -- Mr. Maloney will be off to the high-flying

4    corporate law world, he won't care, but I'll be here still

5    having to figure it out.  Let's do that, all right?

6              MS. SOUTHALL:  Thank you.

7              THE COURT:  Have a good holiday, holiday week, and

8    let's hope the circuit gets to this by the fall.  I think

9    you'll probably -- if it's going to be precedential, you'll

10   have an argument date.  Not you, Mr. Bock.  And hopefully, if

11   that's in the fall, we can get a decision by the end of the

12   year.  Depends on the panel.  All right.

13             MR. BOCK:  Thank you, Your Honor.

14             THE COURT:  Thanks to both of you.

15             MS. SOUTHALL:  Your Honor, one last thing --

16             THE COURT:  Yes, ma'am, sorry.

17             MS. SOUTHALL:  No, I wanted to let you know that Gia

18   DeMarco says hello.

19             THE COURT:  Oh, yes, yes, yes, she's in Newark now.

20        (Court adjourned)

21

22

23

24

25

63

```
 1                         CERTIFICATION
 2   I certify that the foregoing is a correct transcript from the
 3   electronic sound recording of the proceedings in the above-
 4   entitled matter.
 5
 6
 7
 8
 9   _____              _____
10   Signature of Transcriber                 Date
```

8/2/18